[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Hubbard.*, Slip Opinion No. 2021-Ohio-3710.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2021-OHIO-3710

THE STATE OF OHIO, APPELLEE, *v*. HUBBARD, APPELLANT.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Hubbard.*, Slip Opinion No. 2021-Ohio-3710.]**

*Ohio Constitution, Article II, Section 28—Retroactive legislation—"Sierah's Law," R.C. 2903.41 through 2903.44—Violent Offender Database—Application of Sierah's Law to violent offenders who committed their offenses prior to law's effective date does not violate the Retroactivity Clause of Article II, Section 28 of the Ohio Constitution—Court of appeals' judgment affirmed.*

(Nos. 2020-0544 and 2020-0625—Submitted April 14, 2021—Decided October 21, 2021.)

APPEAL from and CERTIFIED by the Court of Appeals for Butler County, No. CA2019-05-086, 2020-Ohio-856.

_____

**KENNEDY, J., announcing the judgment of the court.**

{¶ 1} In this discretionary appeal from a judgment of the Twelfth District Court of Appeals, which also certified a conflict between its judgment and a judgment of the Fifth District Court of Appeals, we consider whether the retroactive

application of "Sierah's Law," R.C. 2903.41 through 2903.44, to offenders who committed their offenses prior to the effective date of those provisions violates the Retroactivity Clause of Article II, Section 28 of the Ohio Constitution.

{¶ 2} The Retroactivity Clause states that the "general assembly shall have no power to pass retroactive laws." This court has held that a statute is unconstitutionally retroactive if (1) the General Assembly expressly made the statute retroactive and (2) the statute is substantive—impairing vested, substantial rights or imposing new burdens, duties, obligations, or liabilities as to a past transaction, such as a retroactive increase in punishment for a criminal offense. *State v. White*, 132 Ohio St.3d 344, 2012-Ohio-2583, 972 N.E.2d 534, ¶ 27, 32, 34; *State v. Williams*, 129 Ohio St.3d 344, 2011-Ohio-3374, 952 N.E.2d 1108, ¶ 8-9.

{¶ 3} Sierah's Law presumptively requires offenders who are convicted of or plead guilty to aggravated murder, murder, voluntary manslaughter, kidnapping, or second-degree-felony abduction, or an attempt to commit, conspiracy to commit, or complicity in committing any of those offenses, to enroll in Ohio's "Violent Offender Database" for a period of ten years. R.C. 2903.41(A)(1) and 2903.42(A)(1). And it presumptively requires an offender to enroll in the database if he or she was convicted of or pleaded guilty to any of those offenses or was serving a term of confinement for the offense on or after the provisions' effective date. R.C. 2903.41(A)(2).

{¶ 4} We have recognized that registration schemes such as Sierah's Law apply retroactively when the duty to register attaches to conduct committed prior to the effective date of the statute. *See, e.g.*, *Williams* at ¶ 8, 21. A review of our caselaw considering registration schemes imposing duties on par with the duties established by Sierah's Law shows that Sierah's Law does not impair a vested, substantial right or impose new burdens, duties, obligations, or liabilities as to a past transaction. In fact, a comparison of the requirements of Sierah's Law to other registration schemes that we have upheld against retroactivity challenges

demonstrates that it is less burdensome and less invasive than those other schemes. *See, e.g.*, *State v. Cook*, 83 Ohio St.3d 404, 700 N.E.2d 570 (1998), *superseded by statute on other grounds as stated in Williams* at ¶ 11; *State v. Ferguson*, 120 Ohio St.3d 7, 2008-Ohio-4824, 896 N.E.2d 110, *superseded by statute on other grounds as stated in Williams* at ¶ 16.  And unlike the registration scheme that this court held to be punitive and therefore unconstitutionally retroactive in *Williams*, Sierah's Law does not retroactively increase the punishment for an offense committed prior to its enactment.

{¶ 5} For these reasons, we determine that the application of Sierah's Law to conduct that occurred prior to its effective date does not violate the Retroactivity Clause of Article II, Section 28 of the Ohio Constitution.  We affirm the judgment of the Twelfth District Court of Appeals.

**Facts and Procedural History**

{¶ 6} On March 7, 2019, appellant, Miquan D. Hubbard, pleaded guilty in the Butler County Common Pleas Court to one count of murder with a firearm specification for the August 2018 killing of Jaraius Gilbert Jr.  Before Hubbard was sentenced on April 30, 2019, the trial court informed him that he would be subject to registration as a violent offender under Sierah's Law, which had gone into effect on March 20, 2019, through the enactment of 2018 Sub.S.B. No. 231.  Hubbard objected, asserting that Sierah's Law violated the Ohio Constitution's Retroactivity Clause.  The trial court overruled the objection, notified Hubbard of his duty to register, and imposed a sentence of 16 years to life in prison and a $250 fine.

{¶ 7} The Twelfth District Court of Appeals affirmed Hubbard's convictions and sentence.  The appellate court determined that Sierah's Law does not affect a substantive right, because it does not retroactively increase the punishment for an eligible offense and classification as a violent offender is merely a collateral consequence of the offender's criminal conduct.  2020-Ohio-856, 146 N.E.3d 593, ¶ 32.  And after reviewing our caselaw considering the

constitutionality of other registration schemes that had been subjected to retroactivity challenges, the court held that Sierah's Law does not "impose a new burden in the constitutional sense," *id*. at ¶ 37, and therefore it may be applied to conduct that occurred prior to its effective date, *id*.

{¶ 8} The Twelfth District certified that its judgment conflicts with the judgment of the Fifth District in *State v. Jarvis*, 2020-Ohio-1127, 152 N.E.3d 1225 (5th Dist.), in which the court of appeals held that the Ohio Constitution prohibits the state from applying Sierah's Law retroactively to an offender whose conduct occurred prior to the legislation's effective date, *id.* at ¶ 37. We determined that a conflict exists between the judgments and agreed to answer the following question of law:

> "Does retroactive application of the violent offender database enrollment statutes codified in sections 2903.41 through 2903.44 of the Revised Code, commonly known as 'Sierah's Law,' violate the Retroactivity Clause of the Ohio Constitution, as set forth in Article II, Section 28 of the Ohio Constitution?"

159 Ohio St.3d 1427, 2020-Ohio-3473, 148 N.E.3d 568, quoting 12th Dist. Butler No. CA2019-05-086 (May 14, 2020).

{¶ 9} We also accepted Hubbard's discretionary appeal to review the following proposition of law: "The retroactive application of Senate Bill 231—Sierah's Law—is unconstitutional as applied to offenses committed prior to the effective date of the statute. Section 28, Article II of the Ohio Constitution." *See* 159 Ohio St.3d 1427, 2020-Ohio-3473, 148 N.E.3d 569.

### Positions of the Parties

{¶ 10} Hubbard maintains that Sierah's Law imposes new burdens, duties, obligations, and liabilities that did not exist at the time that he committed his offense

4

and that the requirement to register as a violent offender is punitive and affects a substantial right, in violation of the Ohio Constitution's Retroactivity Clause. He points out that Sierah's Law is codified in Ohio's criminal code, that the General Assembly did not express a remedial purpose for it, that its registration duties attach to the commission of a criminal offense, that the failure to comply with those duties subjects the registrant to criminal prosecution and the possibility of being required to register for life, and that personally identifiable information in the registration documents is accessible to the public through a public-records request. The application of Sierah's Law, Hubbard asserts, "removes an offender's expectation of sentence finality" and exposes registrants "to continued and unwarranted suspicion of future conduct."

{¶ 11} The state responds that Sierah's Law neither impairs a vested right nor imposes a burden or disability based on a prior transaction, because a felony offender has no reasonable expectation that his or her conviction will never be the subject of future regulation. The state argues that the registration duties imposed by Sierah's Law are less burdensome in comparison to the Revised Code's sex-offender-registration schemes that were previously reviewed by this court—the duty to register as a violent offender does not attach automatically, the registrant has to verify his or her information less frequently and in only one county, and the scheme involves no residential restrictions, publicly accessible databases, or community-notification provisions. For those reasons, the state maintains, Sierah's Law is remedial and may be applied retroactively without violating the Retroactivity Clause.

## Law and Analysis

### The Prohibition Against Retroactive Laws

{¶ 12} " 'Retroactive laws and retrospective application of laws have received the near universal distrust of civilizations.' " *State v. Walls*, 96 Ohio St.3d 437, 2002-Ohio-5059, 775 N.E.2d 829, ¶ 9, quoting *Van Fossen v. Babcock &*

*Wilcox Co.*, 36 Ohio St.3d 100, 104, 522 N.E.2d 489 (1988), *superseded by statute on other grounds as stated in Hannah v. Dayton Power & Light Co.*, 82 Ohio St.3d 482, 484, 696 N.E.2d 1044 (1998). " '[T]he presumption against retroactive legislation is deeply rooted * * * and embodies a legal doctrine centuries older than our Republic.' " *Id.*, quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). We have explained that " '[t]he prohibition against retroactive laws * * * is a protection for the individual who is assured that he may rely upon the law as it is written and not later be subject to new obligations thereby.' " (Ellipsis added in *White*.) *White*, 132 Ohio St.3d 344, 2012-Ohio-2583, 972 N.E.2d 534, at ¶ 34, quoting *Lakengren, Inc. v. Kosydar*, 44 Ohio St.2d 199, 201, 339 N.E.2d 814 (1975).

{¶ 13} The framers of the 1851 Constitution included the Retroactivity Clause in Article II, Section 28, which states that the "general assembly shall have no power to pass retroactive laws." However, "[i]n construing the Retroactivity Clause, we have determined that 'retroactivity itself is not always forbidden by Ohio law.' " *White* at ¶ 31, quoting *Bielat v. Bielat*, 87 Ohio St.3d 350, 353, 721 N.E.2d 28 (2000). "Ohio courts have long recognized that there is a crucial distinction between statutes that merely apply retroactively (or 'retrospectively') and those that do so in a manner that offends our Constitution." *Bielat* at 353.

{¶ 14} To determine whether a statute is *unconstitutionally* retroactive, we apply a two-part test asking (1) whether the General Assembly expressly made the statute retroactive and, if so, (2) whether the statute is substantive or remedial. *Williams*, 129 Ohio St.3d 344, 2011-Ohio-3374, 952 N.E.2d 1108, at ¶ 8. We explained in *Williams* that

> "[i]t is well established that a statute is substantive if it impairs or takes away vested rights, affects an accrued substantive right, imposes new or additional burdens, duties, obligations, or liabilities

> as to a past transaction, or creates a new right. * * * Remedial laws, however, are those affecting only the remedy provided, and include laws that merely substitute a new or more appropriate remedy for the enforcement of an existing right."

(Brackets added in *Williams*.) *Id.* at ¶ 9, quoting *Pratte v. Stewart*, 125 Ohio St.3d 473, 2010-Ohio-1860, 929 N.E.2d 415, ¶ 37.

{¶ 15} Our decision in *Williams* did not depart from those principles to incorporate caselaw construing the United States Constitution's Ex Post Facto Clause, including caselaw involving the intent-effects test established by the United States Supreme Court. Rather, we applied our settled caselaw to determine whether the statutory scheme at issue was substantive or remedial as a matter of statutory construction. "The Ohio Constitution is a document of independent force," *Arnold v. Cleveland*, 67 Ohio St.3d 35, 616 N.E.2d 163 (1993), paragraph one of the syllabus, and we have never interpreted Ohio's Retroactivity Clause in lockstep with the federal Ex Post Facto Clause in criminal cases.

{¶ 16} It is unreasonable to construe *Williams* as adopting a sea-change from our precedent and as overruling decades of our caselaw without this court's actually saying that it was doing so. *See State v. Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, 873 N.E.2d 306, ¶ 12 ("we are not bound by any perceived implications that may have been inferred from" a prior decision); *State ex rel. Gordon v. Rhodes*, 158 Ohio St. 129, 107 N.E.2d 206 (1952), paragraph one of the syllabus ("A reported decision, although in a case where the question might have been raised, is entitled to no consideration whatever as settling, by judicial determination, a question not passed upon or raised at the time of the adjudication"). Consequently, we will apply the Retroactivity Clause as we have consistently interpreted it in criminal cases.

{¶ 17} The parties here agree that the General Assembly expressly made Sierah's Law retroactive, and we recognize that this court has consistently treated statutory registration laws as having retroactive application when the duty to register attaches to a conviction for conduct that occurred prior to the statutory scheme's effective date. *See, e.g.*, *Cook*, 83 Ohio St.3d at 410, 700 N.E.2d 570; *Ferguson*, 120 Ohio St.3d 7, 2008-Ohio-4824, 896 N.E.2d 110, at ¶ 25; *Williams*, 129 Ohio St.3d 344, 2011-Ohio-3374, 952 N.E.2d 1108, at ¶ 8.

{¶ 18} Our focus, then, is on whether Sierah's Law impairs vested, substantial rights or imposes new burdens, duties, obligations, or liabilities as to a past transaction. In conducting that analysis, we have understood that the Retroactivity Clause "prohibits a retroactive increase in punishment for a criminal offense." *White*, 132 Ohio St.3d 344, 2012-Ohio-2583, 972 N.E.2d 534, at ¶ 32.

*Sierah's Law*

{¶ 19} The General Assembly enacted Sierah's Law to require the Ohio Bureau of Criminal Investigation to establish and maintain the Violent Offender Database and to make it available to federal, state, and local law-enforcement officers. R.C. 2903.43(F)(2). The database includes information collected by county sheriffs from "violent offenders," a classification defined to include offenders who, on or after March 20, 2019, (1) are convicted of or plead guilty to aggravated murder, murder, voluntary manslaughter, kidnapping, or second-degree-felony abduction (or an attempt to commit, conspiracy to commit, or complicity in committing any of those offenses), or (2) were serving a term of confinement for any of those offenses on the law's effective date. R.C. 2903.41(A) and 2903.42(A)(1).

{¶ 20} A registration-eligible offender is required to provide to the sheriff of his or her county (1) the offender's full name and any alias used by the offender, (2) the offender's residence address and the name and address of any place of employment or school that the offender attends, (3) the offender's Social Security

number and any driver's license or state-identification card number, (4) the offense committed, (5) the license-plate number, vehicle-identification number, and description of any vehicle owned or operated by the offender or registered in the offender's name, and (6) a description of the offender's scars, tattoos, or other distinguishing marks. R.C. 2903.43(C)(2). The sheriff must photograph the offender, and the offender must provide his or her fingerprints and palmprints. R.C. 2903.43(C)(3). The offender must update that information annually by reenrolling in the database, R.C. 2903.43(D)(1); however, if the offender changes his or her address, he or she is required to inform the sheriff of that change within three business days. R.C. 2903.43(E).

{¶ 21} The Violent Offender Database is not available to the public and may be accessed only by federal, state, and local law-enforcement officers. R.C. 2903.43(F)(2). The enrollment information retained by the sheriff regarding each offender is a public record that may be inspected upon request, except that the offender's Social Security number and driver's license or state-identification card number may not be provided to the public. R.C. 2903.43(F)(3)(a) and (b). The offender may file a motion with the court of common pleas in the county in which he or she resides requesting that any of the information be withheld from the public due to a threat to his or her safety. R.C. 2903.43(F)(3)(c).

{¶ 22} Sierah's Law establishes a presumption that a violent offender must enroll in the database in person, reenroll annually in person, and provide notice of any change of address for ten years after the offender's initial enrollment. R.C. 2903.42(A) and 2903.43(D)(1). The offender may rebut the presumption by proving that he or she was not the principal offender. R.C. 2903.42(A)(4). A trial court may require the offender to enroll even if the offender establishes that he or she was not the principal offender after it considers (1) whether the offender has any prior convictions for an offense of violence and whether those offenses show that the offender has a propensity for violence and (2) the results of a risk

assessment, the offender's degree of culpability or involvement in the offense, and the interests of the public and safety. R.C. 2903.42(A)(4)(i) through (iv).

{¶ 23} A violent offender's reckless failure to comply with Sierah's Law is a fifth-degree felony. R.C. 2903.43(I). The duty to enroll may be extended when, on the state's motion, the court determines that the offender either has been convicted of or pleaded guilty to another felony or any misdemeanor offense of violence during the enrollment period or has violated a term or condition of a sanction imposed under the offender's sentence. R.C. 2903.43(D)(2).

*Sierah's Law Is Not Unconstitutionally Retroactive*

{¶ 24} In *State ex rel. Matz v. Brown*, this court recognized that "a later enactment will not burden or attach a new disability to a past transaction or consideration in the constitutional sense, unless the past transaction or consideration, if it did not create a vested right, created at least a reasonable expectation of finality." 37 Ohio St.3d 279, 281, 525 N.E.2d 805 (1988). We stated, "Except with regard to constitutional protections against ex post facto laws, * * * felons have no reasonable right to expect that their conduct will never thereafter be made the subject of legislation." *Id.* at 281-282. And we explained that "[p]ast felonious conduct is not such a transaction or consideration" that creates a reasonable expectation of finality. *Id.* at 282. Applying that reasoning, we concluded that a statute that retrospectively denied a felony offender eligibility for victims-of-crime compensation was not unconstitutionally retroactive. *Id.*

{¶ 25} In *Cook*, we followed our decision in *Matz* in upholding changes to Ohio's sex-offender-registration scheme enacted by "Megan's Law," 1996 Am.Sub.H.B. No. 180, 146 Ohio Laws, Part II, 2560. *Cook*, 83 Ohio St.3d at 412-413, 700 N.E.2d 570. Relevant to our retroactivity analysis in *Cook*, Megan's Law imposed new registration duties on offenders not previously subject to the requirements, increased the frequency of mandatory address verification, and established community-notification provisions for some offenders. *See id.* at 407-

409, 411. This court reiterated that felony offenders generally have no right to expect that their convictions will not be the subject of future legislation, *id.* at 412, and held that the registration and address-verification requirements were "de minimis procedural requirements that are necessary to achieve the goals of [Megan's Law]," *id.*, that the community-notification provisions did "not impinge on any reasonable expectation of finality [that the] defendant may have had with regard to his conviction," *id.* at 414, and that "the General Assembly could permissibly impose the[] additional obligations without infringing on a substantive right," *id.*

{¶ 26} Enacted in 2003, Am.Sub.S.B. No. 5 ("S.B. 5"), 150 Ohio Laws, Part IV, 6558, amended Megan's Law to require sex offenders to personally register with the sheriff in their county of residence, the county in which they attend school, and the county in which they work, made the sexual-predator designation permanent, and established a publicly available Internet database of sex-offender registrants. *See Ferguson*, 120 Ohio St.3d 7, 2008-Ohio-4824, 896 N.E.2d 110, at ¶ 4, 9. In *Ferguson*, we rejected the notion that "the General Assembly ha[d] transmogrified the remedial statute into a punitive one by the provisions enacted through S.B. 5." *Id.* at ¶ 32. We explained that sex-offender classification is a collateral consequence of the offender's criminal conduct, not a form of punishment, *id.* at ¶ 34, and we stated that "Ohio retroactivity analysis does not prohibit all increased burdens; it prohibits only increased punishment," *id.* at ¶ 39. We also pointed out that " 'consequences as drastic as deportation, deprivation of one's livelihood, and termination of financial support have not been considered sufficient to transform an avowedly regulatory measure into a punitive one.' " *Id.*, quoting *Doe v. Pataki*, 120 F.3d 1263, 1279 (2d Cir.1997). For those reasons, this court in *Ferguson* held that the amendments enacted by S.B. 5 did not violate the Retroactivity Clause of the Ohio Constitution. *Id.* at ¶ 40.

{¶ 27} Ohio's "Adam Walsh Act," which was enacted through 2007 Am.Sub.S.B. No. 10, repealed and replaced Megan's Law and classified sex offenders automatically based on their offense of conviction: a Tier I offender is now required to register every year for 15 years; a Tier II offender is required to register every 180 days for 25 years; and a Tier III offender is required to register every 90 days for life. R.C. 2950.01(E) through (G); 2950.06(B); 2950.07(B). The Adam Walsh Act decreased the amount of time that an offender may live, work, or attend school in a county before having to register in that county (e.g., regarding employment, three consecutive days or an aggregate period of 14 or more days in a calendar year). R.C. 2950.04(A)(2). It also created new community-notification requirements, R.C. 2950.11, and retained the statewide database of sex offenders, R.C. 2950.13(A)(11).

{¶ 28} In *Williams*, this court observed that under the Adam Walsh Act, "sex offenders are required to register more often and for a longer period of time. They are required to register in person and in several different places. * * * [A]ll the registration requirements apply without regard to the future dangerousness of the sex offender * * * and * * * are based solely on the fact of a conviction." 129 Ohio St.3d 344, 2011-Ohio-3374, 952 N.E.2d 1108, at ¶ 20. This court also noted that "[t]he statutory scheme has changed dramatically since this court described the registration process imposed on sex offenders as an inconvenience 'comparable to renewing a driver's license.' And it has changed markedly since this court concluded in *Ferguson* that R.C. Chapter 2950 was remedial." *Williams* at ¶ 16, quoting *Cook*, 83 Ohio St.3d at 418, 700 N.E.2d 570. We therefore held that the new registration, verification, and notification requirements established by the Adam Walsh Act had become "so punitive that its retroactive application is unconstitutional." *Id*. at ¶ 21.

{¶ 29} A comparison of the statutory registry schemes that we upheld in *Cook* and *Ferguson* and invalidated in part in *Williams* demonstrates that Sierah's

Law is not unconstitutionally retroactive. The duty to enroll as a violent offender is far less burdensome than the registration duties imposed by Megan's Law, S.B. 5, or the Adam Walsh Act. In comparison to sex offenders, a violent offender has to register less frequently and in fewer places. And in contrast to a sex offender's registration duties under the Adam Walsh Act, a violent offender's duty to enroll annually for ten years under Sierah's Law is far less burdensome than the requirement to register either once a year for 15 years, every 180 days for 25 years, or every 90 days for life. And unlike the database established under S.B. 5 and retained in the Adam Walsh Act, the violent-offender database itself is not a public record, cannot be accessed by the public over the Internet, and is available only to federal, state, and local law-enforcement officers. Violent offenders are not subject to community notification, and the information about them that is accessible through a public-records request differs little from information that is already available as public records. *See, e.g.*, *State ex rel. Rasul-Bey v. Onunwor*, 94 Ohio St.3d 119, 120-122, 760 N.E.2d 421 (2002) (routine offense and incident reports); *State ex rel. Cincinnati Enquirer v. Winkler*, 101 Ohio St.3d 382, 2004-Ohio-1581, 805 N.E.2d 1094, ¶ 5 (court records), *superseded by rule on other grounds as stated in State ex rel. Parisi v. Dayton Bar Assn. Certified Grievance Commt.*, 159 Ohio St.3d 211, 2019-Ohio-5157, 150 N.E.3d 43.

*Sierah's Law Does Not Impose Punishment*

{¶ 30} Nor does Sierah's Law violate the Retroactivity Clause by establishing "a retroactive increase in punishment for a criminal offense." *White*, 132 Ohio St.3d 344, 2012-Ohio-2583, 972 N.E.2d 534, at ¶ 32. As we said in *State v. Casalicchio*, determining whether a statute imposes a criminal penalty is a question of statutory construction. 58 Ohio St.3d 178, 182, 569 N.E.2d 916 (1991).

{¶ 31} The statutory language of Sierah's Law does not indicate that it was enacted to inflict punishment. Importantly, the General Assembly did not codify Sierah's Law in R.C. Chapter 2929, where penalties and sentences for violent

offenses are contained, and neither Sierah's Law nor the Violent Offender Database are referred to in any of those sentencing provisions. Further, the enrollment requirements are not imposed as part of the offender's sentence and notice of those duties is merely provided to the offender either at his or her sentencing hearing or upon his or her release from incarceration. R.C. 2903.42(A)(1). Including that notice in the judgment of conviction and "[i]nvoking the criminal process in aid of a statutory regime does not render the statutory scheme itself punitive." *Smith v. Doe*, 538 U.S. 84, 96, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003).

{¶ 32} Offender-registration laws are "but a law enforcement technique designed for the convenience of law enforcement agencies through which a list of the names and addresses of felons then residing in a given community is compiled." *Lambert v. California*, 355 U.S. 225, 229, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957). By establishing a violent-offender database that is accessible only by law enforcement and not by the broader community, Sierah's Law evinces the public-safety purpose to collect information about violent offenders and facilitate its being shared with investigative authorities at the federal, state, and local levels. And "where a legislative restriction 'is an incident of the State's power to protect the health and safety of its citizens,' it will be considered 'as evidencing an intent to exercise that regulatory power, and not a purpose to add to the punishment.' " *Smith* at 93-94, quoting *Flemming v. Nestor*, 363 U.S. 603, 616, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960). The General Assembly therefore did not intend for Sierah's Law to inflict additional punishment on violent offenders.

{¶ 33} Nonetheless, we have recognized that a statutory scheme may be "so punitive in purpose or effect as to transform what was clearly intended to be a civil remedy into a criminal penalty." *State v. Martello*, 97 Ohio St.3d 398, 2002-Ohio-6661, 780 N.E.2d 250, ¶ 18. We have noted that the United States Supreme Court has provided useful guideposts in determining whether a statute in effect imposes punishment:

> "Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as punishment, whether it comes into play only on a finding of scienter, whether its operation will promote the traditional aims of punishment— retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned are all relevant to the inquiry, and may point in differing directions."

*Casalicchio*, 58 Ohio St.3d at 182, 569 N.E.2d 916, quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-169, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963). Because these factors are an interpretative tool to gauge legislative intent "in various constitutional contexts, * * * they are 'neither exhaustive nor dispositive.' " *Smith*, 538 U.S. at 97, 123 S.Ct. 1140, 155 L.Ed.2d 164, quoting *United States v. Ward*, 448 U.S. 242, 249, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980). We apply these factors because they are useful, not because an analysis under the Retroactivity Clause (or the Ex Post Facto Clause) requires them.

{¶ 34} The database-enrollment requirements of Sierah's Law do not impose an affirmative disability or physical restraint. As the Sixth Circuit Court of Appeals has explained, "[a]n 'affirmative disability or restraint' generally is some sanction 'approaching the "infamous punishment" of imprisonment.' " *Herbert v. Billy*, 160 F.3d 1131, 1137 (6th Cir.1998), quoting *Hudson v. United States*, 522 U.S. 93, 104, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997), quoting *Flemming* at 617. A requirement to appear and disclose information neither prevents a violent offender from doing something—such as living near schools or working with children—nor physically restrains the offender. Rather, Sierah's Law simply imposes a duty to

appear annually at the sheriff's office, enroll in the registry, and keep the required information up to date. In *Cook*, we rejected the notion that requiring a sex offender to register in person is an affirmative disability or restraint, explaining that "[r]egistering may cause some inconvenience for offenders. However, the inconvenience is comparable to renewing a driver's license. Thus, we find that the inconvenience of registration is a de minimis administrative requirement." 83 Ohio St.3d at 418, 700 N.E.2d 570. This is not "glib minimization," dissenting opinion at ¶ 93, because the enrollment duties imposed by Sierah's Law merely require a violent offender to appear in person at a local office, fill out paperwork, and be photographed—something that other Ohioans do every day. That may happen more than once a year (e.g., if the violent offender changes residences), and the General Assembly has indicated that registration is sufficiently important to make the failure to register a felony, but it does not mean that Sierah's Law imposes an affirmative disability or restraint.

{¶ 35} And the fact that the failure to enroll in the registry is a criminal offense does not make the duty to enroll punitive. Laws often impose duties on certain classes of people and enforce those duties through criminal penalties. *See, e.g.*, R.C. 2151.421(A)(1) and 2151.99 (making it a crime for members of certain professions to fail to report suspicions of child abuse); R.C. 2921.44 (criminalizing dereliction of duty). For a further example, federal law makes it a crime to knowingly evade the duty to register with the Selective Service System, 50 U.S.C. 3811(b), but it may not be said that the federal requirement to register itself is punishment. Common sense says that it is not. After all, "[r]egistration laws are common and their range is wide." *Lambert*, 355 U.S. at 229, 78 S.Ct. 240, 2 L.Ed.2d 228.

{¶ 36} The duty to enroll in the Violent Offender Database does not resemble traditional forms of punishment. The United States Supreme Court has rejected the notion that in-person registration is akin to probation, supervised

16

release, or public shaming. *Smith*, 538 U.S. at 98, 101, 123 S.Ct. 1140, 155 L.Ed.2d 164. Unlike probation or supervised release, Sierah's Law does not impose any conditions on how a violent offender may live his or her life, *compare* Ohio Adm.Code 5120:1-1-12(A) (conditions of release for parole), and the offender is not "under the control and supervision of [a] probation agency," R.C. 2951.06. And in contrast to conditions of parole, Sierah's Law does not prohibit a violent offender from undertaking lawful activities such as consuming alcohol or leaving the state without the government's permission, *see* Ohio Adm.Code 5120:1-1-12(A) and (B). Nor is a violent offender subject to random drug testing or warrantless searches as a condition of release, as a parolee might be. *See, e.g.*, R.C. 2951.05 (random drug testing as a condition of release); R.C. 2951.02(A) (warrantless searches as a condition of release).

{¶ 37} And as the Supreme Court pointed out in *Smith*, "[o]ur system does not treat dissemination of truthful information in furtherance of a legitimate governmental objective as punishment." *Smith* at 99. Therefore, "anecdotal evidence showing the indignities, shame, social ostracism, and very real fear that people subject to reporting and notification laws suffer," dissenting opinion at ¶ 102, is irrelevant in this case. Sierah's Law does not provide for community notification or a searchable public database of offenders, as Ohio's sex-offender-registration laws do. *See* R.C. 2950.11 (community notification); R.C. 2950.13(A)(11) (searchable public database). Allowing a public-records request for information—information that is already a matter of public record and often available elsewhere on the Internet—is not tantamount to public shaming. "The process is more analogous to a visit to an official archive of criminal records than it is to a scheme forcing an offender to appear in public with some visible badge of past criminality." *Smith* at 99. In-person enrollment and reenrollment in the Violent Offender Database and address verification under Sierah's Law therefore does not resemble traditional forms of punishment.

**{¶ 38}** Further, the requirement to enroll in the database does not attach based on a finding of the offender's scienter—R.C. 2903.43(A) provides that "[e]ach violent offender who has [Violent Offender Database] duties imposed pursuant to section 2903.42 of the Revised Code *shall enroll* in the violent offender database personally with the sheriff of the county in which the violent offender resides." (Emphasis added.) *See also Cook*, 83 Ohio St.3d at 419, 700 N.E.2d 570 (relying on similar language to conclude that the imposition of sex-offender-registration duties does not depend on a finding of scienter). Of course, committing murder is already a crime. But in any event, as the United States Supreme Court explained in *Smith*, the factors of whether the regulation comes into play only on a finding of scienter and whether the behavior to which it applies is already a crime carry little weight in determining whether a registration scheme imposes punishment. 538 U.S. at 105, 123 S.Ct. 1140, 155 L.Ed.2d 164. Offender-registration schemes, whether civil or criminal, necessarily apply to people who committed an offense.

**{¶ 39}** And enrollment does not promote the traditional aims of punishment, such as retribution and deterrence. *See Kennedy*, 372 U.S. at 168, 83 S.Ct. 554, 9 L.Ed.2d 644. The state gains little in retribution and deterrence beyond that given by the lengthy prison sentences that are available for violent offenses. Further, we have recognized that offender-registration schemes like Sierah's Law have "long been a valid regulatory technique with [the] remedial purpose" of providing information to law enforcement in order to better protect the public. *Cook* at 419. Any deterrent and retributive value to the state in requiring an offender to enroll annually in the Violent Offender Database pales in comparison to the value to law enforcement of having access to the names, current addresses, and descriptions of violent offenders when law enforcement seeks to locate a kidnapped victim or solve a crime.

{¶ 40} Lastly, the requirement to register once a year is not excessive in relation to the regulatory purpose of allowing law enforcement to know the location and description of violent offenders in order to ensure public safety. The de minimis, administrative requirement to appear at the sheriff's office once a year is "reasonably necessary for the intended purpose of protecting the public," *id.* at 423, as Sierah's Law was designed to do.

{¶ 41} And the risk to public safety posed by violent offenders is not imaginary. The United States Sentencing Commission's 2019 report to Congress on recidivism among federal violent offenders found that "offenders who engaged in violent criminal activity * * * generally recidivated at a higher rate, more quickly, and for more serious crimes than non-violent offenders." United States Sentencing Commission, *Recidivism Among Federal Violent Offenders* 3 (2019), *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2019/20190124_Recidivism_Violence.pdf (last accessed Oct. 12, 2021) [https://perma.cc/UK8F-KVRL]. The report found that "[o]f those violent offenders who recidivated, the median time from release to the first recidivism event was 18 months." *Id.* More than 60 percent of violent offenders were arrested within 8 years of their release, and for 40 percent of the violent offenders who recidivated, the arrest was for a violent offense. *Id.* at 3-4, 13. Further, "[v]iolent offenders recidivated at twice the rate of non-violent offenders among those released after age 40." *Id.* It is therefore not useful to consider the recidivism rates of only those who committed homicide (who typically receive longer sentences and "age-out" of committing additional violent crimes) or sexually oriented offenses (which are defined to include both violent and nonviolent offenses, *see* R.C. 2950.01(A)).

{¶ 42} The United States Supreme Court has determined that a state may reasonably regulate offenders as a class and require registration without first conducting an individualized assessment of future dangerousness. *Smith*, 538 U.S.

19

at 104, 123 S.Ct. 1140, 155 L.Ed.2d 164. Given the high rate of recidivism for violent offenders as a class, a requirement to enroll in the registry for ten years, which may be extended for a violent offender who violates the conditions of his or her release or commits another violent crime, is not excessive in relation to Sierah's Law's remedial purpose to protect the public from violent offenders after their release from prison.

**Conclusion**

{¶ 43} The Retroactivity Clause of Article II, Section 28 of the Ohio Constitution precludes the General Assembly from enacting any law that impairs vested, substantial rights or imposes new burdens, duties, obligations, or liabilities as to a past transaction, such as inflicting punishment for conduct that occurred before the law's effective date. This court has long recognized that offenders do not have any reasonable expectation that their status as convicted felons will not be made subject to future legislation, including offender-registration and address-verification laws. Our caselaw also holds that offender-registration schemes that are more burdensome than Sierah's Law do not retroactively increase the punishment for a criminal offense.

{¶ 44} Fidelity to precedent "is the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." *Payne v. Tennessee*, 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). It "permits society to presume that bedrock principles are founded in the law rather than in the proclivities of individuals, and thereby contributes to the integrity of our constitutional system of government, both in appearance and in fact." *Vasquez v. Hillery*, 474 U.S. 254, 265-266, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986). Respect for our prior decisions is therefore "a foundation stone of the rule of law, necessary to ensure that legal rules develop 'in a principled

and intelligible fashion.' " *Michigan v. Bay Mills Indian Community*, 572 U.S. 782, 798, 134 S.Ct. 2024, 188 L.Ed.2d 1071 (2014), quoting *Vasquez* at 265.

{¶ 45} Consistent with decades of precedent that guides our analysis today, we determine that the application of Sierah's Law to violent offenders who committed their offenses prior to its effective date does not violate the Retroactivity Clause of the Ohio Constitution. We affirm the judgment of the Twelfth District Court of Appeals.

Judgment affirmed.

FISCHER and DEWINE, JJ., concur.

O'CONNOR, C.J., concurs in judgment only.

STEWART, J., dissents, with an opinion joined by DONNELLY and BRUNNER, JJ.

_____

**STEWART, J., dissenting.**

{¶ 46} Because I disagree with this court's application of the Retroactivity Clause of Article II, Section 28 of the Ohio Constitution, and because I believe that "Sierah's Law," R.C. 2903.41 through 2903.44, is punitive and may not be applied retroactively, I respectfully dissent.

**I. Ohio's Retroactivity Clause Prohibits Ex Post Facto Laws**

{¶ 47} This court's jurisprudence on Article II, Section 28 of the Ohio Constitution has caused confusion in the context of legislation involving retroactive criminal punishment. Not only is that confusion evident in the parties' and lower courts' valiant attempts to synthesize our decisions in *State v. Cook*, 83 Ohio St.3d 404, 700 N.E.2d 570 (1998), *superseded by statute on other grounds as stated in State v. Williams*, 129 Ohio St.3d 344, 2011-Ohio-3374, 952 N.E.2d 1108, ¶ 11, *State v. Ferguson*, 120 Ohio St.3d 7, 2008-Ohio-4824, 896 N.E.2d 110, *superseded by statute on other grounds as stated in Williams* at ¶ 16, and *Williams*, it is exacerbated by the lead opinion and court's judgment today. We may easily

remedy that confusion by doing two simple things: (1) definitively declaring that the prohibition against "retroactive laws" under the Ohio Constitution includes the prohibition against ex post facto laws—laws that either *expressly* or *effectively* increase the punishment for a person's past criminal conduct, and (2) instructing courts to conduct a full ex post facto analysis as part of the Retroactivity Clause analysis when a claim of retroactive, increased punishment is raised.

{¶ 48} A full ex post facto analysis requires the application of the "intent-effects" test. *See Smith v. Doe*, 538 U.S. 84, 92-93, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003). Under that test, a court is required to determine whether the legislature intended to enact a civil, remedial law or a criminal, punitive one. *Id.* at 92-93. "If the intention of the legislature was to impose punishment, that ends the inquiry." *Id.* at 92. But if the legislature intended to enact a civil, remedial law, then the court must also examine whether the law is so punitive in purpose or effect as to override the legislature's intent to enact a remedial law. *Id.* A new law that intentionally punishes criminal behavior that predated the law or that upon scrutiny is found to have the purpose or effect of punishing such criminal behavior is ex post facto and thus unconstitutional. *Id.* at 92-93, 97.

{¶ 49} The reason that our caselaw regarding retroactive criminal legislation is confusing is that this court has consistently failed to apply the full ex post facto intent-effects test to claims that a new law violates the Ohio Constitution's Retroactivity Clause by increasing punishment for criminal conduct that predated the law's enactment. Instead, this court has generally applied the intent-effects test only when a defendant has explicitly claimed that a law is punitive and violates the Ex Post Facto Clause of Article I, Section 10 of the United States Constitution. *See, e.g., Cook* at 404, 415-423. However, because Ohio's Retroactivity Clause prohibits ex post facto laws, which involve criminal punishment, *id.* at 415, in addition to certain retroactive civil laws, the intent-effects test should be applied as part of a court's analysis whenever a claim of retroactive

punishment is raised—not just when such a claim is raised under the United States Constitution's Ex Post Facto Clause.

*A. The History of Ohio's Retroactivity Clause*

{¶ 50} The Ohio Constitution's Retroactivity Clause was drafted in its present form at the Ohio Constitutional Convention of 1850-1851, and it became part of the Ohio Constitution of 1851 upon its ratification. The Ohio Constitution of 1802 had declared that "[n]o ex post facto law, nor any law impairing the validity of contracts, shall ever be made." Ohio Constitution of 1802, Article VIII, Section 16. The result of the 1850-1851 convention was that the reference in Article VIII, Section 16 to "ex post facto law[s]" was removed and the reference in Article II, Section 28 to "retroactive laws" took its place—but not before considerable, illuminating debate on the issue.

{¶ 51} The 1850-1851 convention debates show conclusively that the term "retroactive laws" broadly encompasses both retroactive criminal laws—that is, ex post facto laws—*and* retroactive civil laws. 1 *Official Reports of the Debates and Proceedings of the Ohio State Convention, Called to Alter, Revise or Amend the Constitution of the State* 247-249 (1851). The provision at issue here was first introduced to the delegates as follows: "The General Assembly shall have no power to pass retro-active laws, or laws impairing the obligations of contracts or their remedies." *Id.* at 232. Immediately upon its introduction, one delegate moved to strike the whole section. *Id.* That delegate noted that it was possible that he did not comprehend "exactly what was intended by the term retro-active," but it seemed to him that the word had the same meaning as the term " '*ex post facto*.' " (Emphasis sic.) *Id.* It was therefore his position that the prohibitions in the United States Constitution were "sufficient to prohibit the General Assembly from passing any *ex post facto* law, or law impairing the obligation of contracts, without the necessity of any additional * * * restriction [in the Ohio Constitution]." (Emphasis sic.) *Id.*

{¶ 52} Not every delegate to the 1850-1851 convention was a lawyer. However, some delegates were lawyers and explained that the term "ex post facto" generally referred to only retroactive criminal laws, whereas retroactive civil laws were generally referred to simply as "retro-active." *Id.* at 233-234. Eventually, another delegate proposed replacing the word "retro-active" with the term "ex post facto," thus preserving the legislature's ability to pass curative civil laws. *Id.* At that point, Charles Reemelin, one of the leading architects of Ohio's constitution,[1] interjected in defense of the provision as proposed. *Id.* at 235. Reemelin explained that the committee that wrote the provision, of which he was a member, had paid considerable attention to the language used in the provision and that the word "retro-active" was a "mere literal translation of the Latin '*ex post facto.*'" (Emphasis sic.) *Id.* Indeed, "[h]e [had] found this word[, retro-active,] in the constitution of almost every State in the union" at that time. *Id.* Reemelin then expressed that

> if the [objecting delegates] liked the Latin terms better, it was a mere matter of taste; but for himself he preferred the English. If the Latin were better than the English, and the English did not satisfy the [objecting delegates], he would not object to putting in the Latin on top of the English in order to make the signification as full and complete as possible.

*Id.*

---

1.        *See* Ohio History Central, *Ohio Constitution of 1851*, https://ohiohistorycentral.org/index.php?title=Ohio_Constitution_of_1851&mobileaction=toggle_view_desktop (accessed Oct. 12, 2021) [https://perma.cc/FGU8-E8F3]; Ohio History Central, *Charles Reemelin*, https://ohiohistorycentral.org/w/Charles_Reemelin (accessed Oct. 12, 2021) [https://perma.cc/8Z36-HYDW].

{¶ 53} Shortly thereafter, a different delegate interjected and asked Reemelin whether "the term 'retro-active' was understood to be confined to criminal affairs, and not to extend to civil remedies." *Id.* Reemelin unhesitatingly declared, in terms that any textualist could appreciate, that "[t]he section could certainly speak for itself. Retro-active is a comprehensive term; it includes *all* such laws." (Emphasis sic.) *Id.*

{¶ 54} Although the delegates continued to debate other aspects of the provision, there seems to have been little further debate on whether the term "retro-active laws" included by implication ex post facto laws—that is, retroactive criminal laws; Reemelin had apparently cleared up that question categorically. Only the propriety of restricting the legislature's ability to enact curative civil legislation remained up for debate, and when the convention reconvened that winter, the delegates adopted the provision with the term "retroactive" in place. *See* Ohio Constitution, Article II, Section 28.

{¶ 55} The debates during the 1850-1851 Constitutional Convention reveal that its delegates understood that ex post facto laws were included within the scope of the Retroactivity Clause's prohibitions.[2] This court failed to conduct an ex post

---

2. This court has implied that the Ohio Constitution's Retroactivity Clause includes within its scope a ban of ex post facto laws. In *State v. Walls*, we stated:

> Walls limits his ex post facto argument here to the federal Constitution. We note, however, that various courts of appeals have observed that the prohibition of "retroactive laws" in Section 28, Article II of the Ohio Constitution includes a prohibition of ex post facto laws. *See State v. Gleason*, 110 Ohio App.3d 240, 246, 673 N.E.2d 985 ([9th Dist.]1996); *State v. Smith*, 16 Ohio App.3d 114, 116, 474 N.E.2d 685 ([1st Dist.]1984), fn. 4; *State v. Ahedo*, 14 Ohio App.3d 254, 256, 470 N.E.2d 904 ([8th Dist.]1984); *State ex rel. Corrigan v. Barnes*, 3 Ohio App.3d 40, 443 N.E.2d 1034 ([8th Dist.]1982). This court has also implied as much. *See, e.g.*, *Van Fossen* [*v. Babcock & Wilcox Co.*], 36 Ohio St.3d [100,] 107, 522 N.E.2d 489 [(1998)] (observing that Section 28, Article II was "a much stronger prohibition" on retroactive legislation than its precursor, which was limited to ex post facto laws and laws impairing contracts).

facto analysis as part of its Retroactivity Clause analyses in *Cook*, 83 Ohio St.3d 404, 700 N.E.2d 570, and *Ferguson*, 120 Ohio St.3d 7, 2008-Ohio-4824, 896 N.E.2d 110, but then it in effect did do so in *Williams*, 129 Ohio St.3d 344, 2011-Ohio-3374, 952 N.E.2d 1108. That inconsistency has unnecessarily caused lasting confusion.

**{¶ 56}** When we reviewed the constitutionality of Ohio's "Megan's Law," 1996 Am.Sub.H.B. No. 180 ("H.B. 180"), 146 Ohio Laws, Part II, 2560, in *Cook*, our analysis was two-fold. First, we analyzed whether the new statutory scheme, which became effective in 1997 as part of H.B. 180's amendments to Revised Code Chapter 2950 and replaced a less burdensome sex-offender-registration scheme that was established in 1963, violated Ohio's Retroactivity Clause when applied to offenses that were committed before the law went into effect. *Cook* at 410-414. Second, we analyzed whether the law violated the Ex Post Facto Clause of the federal Constitution. *Id.* at 414-423.

**{¶ 57}** Regarding our analysis under Ohio's Retroactivity Clause, we first determined that the law was specifically made retroactive. *Id.* at 410. Next, we considered whether the law was "substantive" or "remedial."[3] *Id.* at 410-411. It was the argument of amicus curiae Ohio Public Defender that the registration and

---

96 Ohio St.3d 437, 2002-Ohio-5059, 775 N.E.2d 829, ¶ 20, fn. 4.

3. We have stated that a statute runs afoul of the Ohio Constitution's prohibition against retroactive laws when it is substantive, rather than remedial, in nature. *See Van Fossen* at 106-107, *superseded by statute on other grounds as stated in Hannah v. Dayton Power & Light Co.*, 82 Ohio St.3d 482, 484, 696 N.E.2d 1044 (1998), fn. 2. And we have also explained: "[A] statute is substantive if it impairs or takes away vested rights, affects an accrued substantive right, imposes new or additional burdens, duties, obligations, or liabilities as to a past transaction, or creates a new right." *Pratte v. Stewart*, 125 Ohio St.3d 473, 2010-Ohio-1860, 929 N.E.2d 415, ¶ 37, citing *Van Fossen* at 107; *see also Williams*, 129 Ohio St.3d 344, 2011-Ohio-3374, 952 N.E.2d 1108, at ¶ 8-9. "Remedial laws, however, are those affecting only the remedy provided, and include laws that merely substitute a new or more appropriate remedy for the enforcement of an existing right." *Pratte* at ¶ 37, citing *Van Fossen* at 107.

notification provisions of Megan's Law were substantive because they imposed additional burdens with respect to a past transaction. *Id.* at 411. We rejected that argument, repeating what we said in *State ex rel. Matz v. Brown*, 37 Ohio St.3d 279, 281-282, 525 N.E.2d 805 (1988)—that when no vested right has been created, a later enactment will not burden or attach a new disability to a past transaction in the constitutional sense unless there was at least a reasonable expectation of finality, which is something that a person lacks as to his or her past offenses, with the exception of the constitutional protection against ex post facto laws. *Cook* at 412-414. Ultimately, we determined that Cook had no vested right to register under the prior sex-offender-registration law that was in force at the time of his offense and that the new law's requirements did not interfere with any expectation of finality. *Id.* In reaching that conclusion, we noted that the new registration and address-verification requirements were "*de minimis* procedural requirements * * * necessary to achieve the goals of [the law]," and that the community-notification requirement, which might result in social ostracism and harassment, amounted to only the dissemination of truthful information as a means of advancing public safety. (Emphasis sic.) *Id.* This court, in other words, did not find those aspects of the law to be "punitive."

{¶ 58} Noticeably absent from the Retroactivity Clause analysis in *Cook* was any meaningful discussion of the legislature's intent behind the statute or what, if any, punitive purpose or effect the law might have separate from the legislature's intent. Instead, we reserved that analysis for the application of the federal Ex Post Facto Clause. *See Cook*, 83 Ohio St.3d at 414-415, 700 N.E.2d 570.

{¶ 59} In reviewing the constitutionality of Megan's Law under the Ex Post Facto Clause of Article I, Section 10 of the United States Constitution, we began from the sound premise that the "Ex Post Facto Clause applies only to criminal statutes," *Cook* at 415, and that any statute that makes the punishment for an offense more burdensome after its commission is ex post facto, *id.* at 414. We then applied

the "intent-effects" test. *Id.* at 415. As to the law's intent, we concluded that the General Assembly intended to enact a civil, remedial law, not a punitive one. *Id.* at 416-417. We noted that the legislature's intent was stated expressly in certain declarations and legislative findings within the law itself and could also be seen in the law's narrow tailoring. *See id.* As for the law's effects, this court applied the seven-factor analysis that was outlined by the United States Supreme Court in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-169, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963)—factors that are useful in determining whether a law is punitive in purpose or effect despite the legislature's intent. *See Cook* at 418. Ultimately, we concluded that the *Mendoza-Martinez* factors weighed in favor of holding that Megan's Law was not punitive but rather served the remedial purpose of protecting the public. *Id.* at 423. Since the law was civil and remedial in nature, we concluded that it did not violate the federal Ex Post Facto Clause. *Id.*

{¶ 60} When this court considered in *Ferguson*, 120 Ohio St.3d 7, 2008-Ohio-4824, 896 N.E.2d 110, the 2003 amendments to Megan's Law under Am.Sub.S.B. No. 5 ("S.B. 5"), 150 Ohio Laws, Part IV, 6558, similar questions arose. Ferguson argued that the amendments, which took away the trial court's discretion to amend his sex-offender classification, increased his reporting obligations, and made his personal information widely available to the public, caused the law to cross the line from a civil, remedial law to a criminal, punitive one. *Ferguson* at ¶ 5, 8-10. He asserted that when retroactively applied, the law violated both Ohio's Retroactivity Clause and the Ex Post Facto Clause of the federal Constitution. *Id.* at ¶ 1.

{¶ 61} In analyzing the constitutionality of the law under Ohio's Retroactivity Clause, this court focused almost exclusively on the legislature's intent behind the law, without giving any consideration to whether the law was punitive in purpose or effect. *See id.* at ¶ 27-40. We began by noting that a sex offender's classification "is a collateral consequence of the offender's criminal acts

rather than a punishment per se." *Id.* at ¶ 34. As such, this court determined that Ferguson could not establish "that he had any reasonable expectation of finality in a collateral consequence that *might* be removed." (Emphasis sic.) *Id.* Citing *Matz*, this court held that "[a]bsent such an expectation, there is no violation of the Ohio Constitution's retroactivity clause." *Ferguson* at ¶ 34, citing *Matz*, 37 Ohio St.3d at 282, 525 N.E.2d 805. We also said that "the United States Supreme Court and other state appellate courts [had] upheld provisions similar to the permanent, lifetime classification imposed by S.B. 5's amendments." *Id.* at ¶ 35, citing *Smith*, 538 U.S. at 90, 103-104, 123 S.Ct. 1140, 155 L.Ed.2d 164, and *Commonwealth v. Lee*, 594 Pa. 266, 935 A.2d 865, 885 (2007). This court explained that central to the holdings in *Smith* and *Lee* was the understanding that the legislatures in those cases had "found recidivism rates of sex offenders to be alarming and that an offender's recidivism may occur years after his release from confinement rather than soon after his initial reentry to society." *Ferguson* at ¶ 35. Based on the General Assembly's similar findings and expressions of its intent in the language of S.B. 5, this court determined that the elimination of the provision that permitted the removal of Ferguson's sex-offender classification was "not driven by a punitive or retributive intent" but was rather "an effort to better protect the public from the risk of recidivist offenders by maintaining the * * * classification so that the public had notice of the offender's past conduct—conduct that arguably is indicative of future risk." *Id.*

{¶ 62} This court noted that Ferguson might be "adversely affected by the amended provisions" and that the registration and notification requirements subjected him to public "scorn." *Id.* at ¶ 37. Nevertheless, we did not find that aspect of the law to be punitive. *See id.* Citing again the United States Supreme Court's decision in *Smith*, the majority stated, "If a legislative restriction is an incident of the state's power to protect the health and safety of its citizens, it should be considered as evidencing an intent to exercise that regulatory power rather than

as an intent to punish." *Ferguson* at ¶ 37, citing *Smith* at 92-93. Summarizing its Retroactivity Clause analysis, this court stated that "Ohio retroactivity analysis does not prohibit all increased burdens; it prohibits only increased punishment" and "a statutory scheme that serves a regulatory purpose 'is not punishment even though it may bear harshly upon one affected.' " *Id.* at ¶ 39, quoting *Flemming v. Nestor*, 363 U.S. 603, 614, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960).

{¶ 63} Having concluded that the law did not violate Ohio's Retroactivity Clause, the court then addressed Ferguson's federal ex post facto claim. *Ferguson*, 120 Ohio St.3d 7, 2008-Ohio-4824, 896 N.E.2d 110, at ¶ 41-43. We summarily addressed that claim without much discussion on the dubious grounds that this court had consistently determined that Ohio's sex-offender-registration scheme was civil and remedial[4] in nature and thus could not be "deemed unconstitutional on ex post facto grounds." *Id.* at ¶ 43.

---

4. This court referred to our decisions in *Cook*, 83 Ohio St.3d 404, 700 N.E.2d 570, *State v. Williams*, 88 Ohio St.3d 513, 728 N.E.2d 342 (2000), and *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264. In *Williams*, which was decided less than two years after our decision in *Cook*, this court upheld Megan's Law against additional constitutional challenges, including challenges under the Double Jeopardy and Equal Protection Clauses of the United States and Ohio Constitutions. *Id.* at 516. As part of our analysis, we affirmed that the provisions of Megan's Law enacted in 1997 as part of H.B. 180 were civil and not criminal in nature. *Id.* at 528. Seven years later, in *Wilson*, the question before us concerned which manifest-weight-of-the-evidence standard of review—civil or criminal—applied when reviewing a trial court's sex-offender-classification determination. *Wilson* at ¶ 1. Notably, by the time that this court decided *Wilson*, the legislature had made significant changes to Megan's Law through amendments enacted in 2003 as part of S.B. 5. *See id.* at ¶ 45 (Lanzinger, J., concurring in part and dissenting in part). This court in *Wilson* held—based *exclusively* on the court's prior decisions in *Cook* and *Williams*—that the civil standard applied because the law had previously been determined to be civil. *Id*. at ¶ 30-32. In so holding, the majority opinion paid no attention to the fact that the law had changed since our decisions in *Cook* and *Williams*—a flaw that was discussed at length in the opinion concurring in part and dissenting in part, which, applying some semblance of the intent-effects test, found that the S.B. 5 changes to the law rendered the law punitive. *See id.* at ¶ 43-49 (Lanzinger, J., concurring in part and dissenting in part).

When this court decided *Ferguson* approximately 1.5 years later, the issue whether the S.B. 5 amendments to Megan's Law rendered the law punitive was squarely before the court. *Ferguson* at ¶ 1. As noted above, in deciding that the law was not punitive as part of its Retroactivity Clause analysis, the court looked only to the intent of the legislature and not to the actual effect of the law. *See id.* at ¶ 27-39. This court did not address whether the law violated the federal Ex Post Facto

**{¶ 64}** If our decisions in *Cook*, 83 Ohio St.3d 404, 700 N.E.2d 570, and *Ferguson* demonstrate anything clearly, it is the unease that this court has when it is confronted with a claim that a law is unconstitutional under Ohio's Retroactivity Clause because the law punishes criminal conduct that predated it. Rather than taking a measured approach to questions regarding retroactive punishment by scrutinizing both the legislature's intent and the practical purposes and effects of the law—as other courts have done[5]—this court's default is to simply reassert what it said in *Matz*, 37 Ohio St.3d at 281-282, 525 N.E.2d 805—that a person has no expectation of finality regarding his or her past offenses—before assigning various nonpunitive rationales to the law's more burdensome, disadvantaging, or punitive aspects. *See Cook* at 410-414; *Ferguson* at ¶ 27-40. Naturally, that approach results in the conclusion that the law is remedial and therefore permissibly retroactive. But the approach does little to discern whether the law is, in fact, punitive. And it goes without saying that a law that is punitive in fact is a *substantive* law, not a remedial one.

### B. This Court's Failure to Apply the Full Ex Post Facto Analysis

**{¶ 65}** For more than 20 years, this court has shown an obvious hesitation to apply the full ex post facto analysis when considering whether a law violates Ohio's Retroactivity Clause, beginning with our decision in *Cook* and extending to today. The reason for that hesitation is hard to discern. Perhaps there remains some uncertainty about whether Ohio's Retroactivity Clause prohibits ex post facto laws in addition to certain retroactive civil laws. But there should be no uncertainty. As

---

Clause, because Ohio's sex-offender-registration scheme had been deemed civil and remedial in *Cook*, *Williams*, and *Wilson*. *See Ferguson* at ¶ 41-43. However, none of those cases subjected the S.B. 5 amendments to the intent-effects test. Since this court has never addressed the question, it remains undetermined whether the S.B. 5 amendments to Megan's Law were actually punitive in effect.

5. *See, e.g.*, *State v. Trujillo*, 248 Ariz. 473, 477, 462 P.3d 550 (2020) ("In determining whether a statute is civil or criminal, courts generally apply the 'intent/effects test' "), citing *Smith*, 538 U.S. at 92, 123 S.Ct. 1140, 155 L.Ed.2d 164; *Does 1-7 v. Abbott*, 945 F.3d 307, 314 (5th Cir.2019) (to determine whether a statute is punitive, "[c]ourts use an intents-effects test").

explained above, even the majority in *Ferguson* recognized that Ohio's Retroactivity Clause prohibits increased punishment. *Ferguson* at ¶ 39 ("Ohio retroactivity analysis does not prohibit all increased burdens; it prohibits only increased punishment"). Put another way, it would seem to be black-letter law that a retroactive increase in punishment for a criminal offense is by definition an ex post facto law. *See Cook* at 414-415. " '[A]ny statute which * * * makes more burdensome the punishment for a crime, after its commission, * * * is prohibited as *ex post facto*.' " (Brackets, second ellipsis, and emphasis added in *Beazell*.) *Id.* at 414, quoting *Beazell v. Ohio*, 269 U.S. 167, 169-170, 46 S.Ct. 68, 70 L.Ed. 216 (1925); *see also Beazell* at 167 (noting in the disjunctive three settled instances in which ex post facto applies).

{¶ 66} Whatever the *Ferguson* majority's reasons were for not applying a full ex post facto analysis,[6] the dissenting opinion admonished the majority for focusing myopically on the legislature's remedial intent and lack of punitive intent while ignoring the punitive effect of the amendments. *See Ferguson*, 120 Ohio St.3d 7, 2008-Ohio-4824, 896 N.E.2d 110, at ¶ 51 (Lanzinger, J., dissenting). The dissenting opinion noted that the permanency of certain sex-offender designations, the more demanding registration and community-notification requirements, the residency restrictions, and the sheriff's authority to request a landlord's verification of an offender's address, among other things, made the law punitive in effect despite the legislature's avowed remedial purpose for the law. *Id.* at ¶ 45-46 (Lanzinger, J., dissenting). Specifically, the dissenting opinion stated, "Admittedly, S.B. 5 has a legitimate civil purpose: to promote public safety by

---

6. It is also interesting that although the majority in *Ferguson* seemingly went out of its way to avoid applying the intent-effects test in determining that the law was not punitive, instead opting to focus on the legislature's expressions of its remedial intent, the majority nevertheless consistently cited as support for its holding the United States Supreme Court's decision in *Smith*, 538 U.S. 84, 123 S.Ct. 1140, 155 L.Ed.2d 164, and the decisions of other state courts, all of which *had done* an extensive ex post facto intent-effects analysis of the laws at issue in those cases. *See Ferguson*, 120 Ohio St.3d 7, 2008-Ohio-4824, 896 N.E.2d 110, at ¶ 34-38.

alerting the public to potentially recidivist sex offenders in the community. *But its scope notably exceeds this purpose*." (Emphasis added.) *Id*. at ¶ 58 (Lanzinger, J., dissenting). The dissent applied the *Mendoza-Martinez* factors and determined that the law was punitive in fact, even if not in its intent. *See Ferguson* at ¶ 56-61 (Lanzinger, J., dissenting).

{¶ 67} The factor that is often considered the most critical in determining whether a new law in fact punishes past criminal behavior—or in other words is an ex post facto law—is whether the law is excessive in relation to its remedial purpose. *See, e.g.*, *Kellar v. Fayetteville Police Dept.*, 339 Ark. 274, 286, 5 S.W.3d 402 (1999) ("It is the seventh and final factor which weighs most heavily in the balance in Arkansas, as in most other states: the question of whether the [law] is excessive in relation to its alternative purposes"); *Commonwealth v. Mullins*, 905 A.2d 1009, 2006 PA Super 215, ¶ 16 (Pa.Super.2006) ("Most relevant to the issue in the instant appeal * * * is the last *Mendoza-Martinez* factor * * *, which involves an examination of excessiveness when determining whether a statute has a punitive effect"); *Rodriguez v. State*, 93 S.W.3d 60, 75 (Tex.Crim.App.2002) ("[O]f all the * * * factors, this factor cuts most directly to the question of which statutes cross the boundaries of civil sanctions, and which do not. * * * Accordingly, we afford this factor considerable weight in deciding whether the amendments are punitive-in-fact").

{¶ 68} And although this court did not state that it was applying the ex post facto intent-effects test in our 2011 decision in *Williams*, 129 Ohio St.3d 344, 2011-Ohio-3374, 952 N.E.2d 1108, that is in effect what we did. In *Williams*, it is clear that the excessiveness of the law at issue in that case, Ohio's "Adam Walsh Act," 2007 Am.Sub.S.B. No. 10 ("S.B. 10"), in relation to its remedial purpose was what ultimately tipped the scales and led a majority of this court to hold that the S.B. 10 amendments to R.C. Chapter 2950 rendered Ohio's sex-offender-registration scheme punitive in effect. *See Williams* at ¶ 20-21.

{¶ 69} Our determination in *Williams* that S.B. 10 violated Ohio's Retroactivity Clause, because it imposed " 'new or additional burdens, duties, obligations, or liabilities as to a past transaction,' " *id*. at ¶ 20, quoting *Pratte v. Stewart*, 125 Ohio St.3d 473, 2010-Ohio-1860, 929 N.E.2d 415, ¶ 37, was questioned by the Twelfth District Court of Appeals in its decision below in this case, *see* 2020-Ohio-856, 146 N.E.3d 593, ¶ 27-29, and has been questioned by other Ohio appellate courts, *see, e.g.*, *State v. Caldwell*, 2014-Ohio-3566, 18 N.E.3d 467, ¶ 23-24 (1st Dist.), on the grounds that it appears out of place with our earlier retroactivity jurisprudence. The main point of contention seems to be that we never explicitly stated in *Williams* that the S.B. 10 amendments impaired a vested right or that Williams had a reasonable expectation of finality regarding his criminal conduct that was affected by the law. Although this court in *Williams* should have been clearer about its mode of analysis and the analytical framework that it was applying—and again, that is the persistent problem with our Retroactivity Clause jurisprudence concerning claims of increased punishment—the context of *Williams* clears up a lot here. What we said in *Williams* must be viewed in the greater context of what was being analyzed: whether the law retroactively increased punishment for a past offense or, in other words, whether it was an ex post facto law. We effectively determined that it was. Thus, in light of what we said in *Matz*, 37 Ohio St.3d at 281-282, 525 N.E.2d 805—that a person has a reasonable expectation that his or her past criminal conduct will not be subject to ex post facto laws—it makes sense that the *Williams* court held as it did.

{¶ 70} We do not need Sherlock Holmes to crack this case. It is not true, as the Twelfth District stated in its decision below, that our decision in *Williams* departed from any " 'familiar framework' " in which we normally ask " 'whether the retroactive application of a new law burdened a vested right or a reasonable expectation of finality.' " 2020-Ohio-856, 146 N.E.3d 593, at ¶ 29, quoting *Caldwell* at ¶ 25. If *Williams* seems different from our other cases, it is

only because it marks the first time that a majority of this court, when confronted with a claim that a law retroactively increased punishment in violation of Ohio's Retroactivity Clause, in essence applied the correct full test—the intent-effects test—to determine whether the law was actually punitive.

{¶ 71} This court's jurisprudence on Ohio's Retroactivity Clause leads us to where we are now: the present jurisdictional appeal and certified conflict between the Twelfth District Court of Appeals and Fifth District Court of Appeals, wherein through sincere efforts to synthesize our Retroactivity Clause caselaw, the appellate courts reached opposite conclusions on what that caselaw meant and how to apply it. *See* 2020-Ohio-856, 146 N.E.3d 593, at ¶ 25-33; *State v. Jarvis*, 2020-Ohio-1127, 152 N.E.3d 1225, ¶ 24-34 (5th Dist.). It also leaves us with appellee, the state of Ohio, and amicus curiae Ohio Attorney General Dave Yost arguing that there is no sufficiently "vested right" or "reasonable expectation" of finality at issue here, even though Hubbard's arguments (and those of the defendant in *State v. Jarvis*, ___ Ohio St.3d ___, 2021-Ohio-3712, ___ N.E.3d ___) are centered on claims of increased retroactive punishment.

{¶ 72} In the face of this confusion, the lead opinion's statements and conclusions are odd. The lead opinion professes that in *Williams* this court did not depart from its "settled caselaw." Lead opinion at ¶ 15. It asserts that *Williams* in no way incorporated caselaw construing the Ex Post Facto Clause of the federal Constitution, including caselaw involving the intent-effects test traditionally applied in the ex post facto context. The lead opinion goes on to claim that this court has been consistent in its interpretation of Ohio's Retroactivity Clause in criminal cases, and that this court's consistent interpretation of the law guides its analysis in this case. The lead opinion's assertions are simply incorrect.

{¶ 73} To start, very little about this court's Retroactivity Clause caselaw—at least in the criminal-law context—may be called "settled." While we may have consistently referred to our test for determining whether a law is substantive or

35

remedial in *Cook*, *Ferguson*, and *Williams*, we have never explained how a claim of retroactive criminal punishment fits within that test or how such a claim should be analyzed. Indeed, even the lead opinion, with its assurance that the law on this issue is perfectly settled, has done no better in synthesizing our caselaw than to state:

> Our focus, then, is on whether Sierah's Law impairs vested, substantial rights or imposes new burdens, duties, obligations, or liabilities as to a past transaction. In conducting that analysis, we have understood that the Retroactivity Clause "prohibits a retroactive increase in punishment for a criminal offense." [*State v.*] *White*, 132 Ohio St.3d 344, 2012-Ohio-2583, 972 N.E.2d 534, ¶ 32.

Lead opinion at ¶ 18. But what does that mean and how does it work? From where does this understanding derive? Is the public to assume, based on these statements, that a retroactive increase in criminal punishment impairs vested, substantial rights? Or is the public to understand that a retroactive increase in criminal punishment imposes new burdens, duties, obligations, or liabilities as to a past transaction? Or is something else meant? The lead opinion does not answer those questions. If the lead opinion wants to settle our caselaw in this area, it would do well to explain how a claim of retroactive criminal punishment fits within the test for determining whether a retroactive law is substantive or remedial, which is the central issue causing confusion in the appellate courts and among the parties and their amici curiae in this case. And it is something that the lead opinion fails to clear up despite its being perfectly positioned to do so.

{¶ 74} Additionally, the lead opinion is mistaken that in *Williams* we never incorporated caselaw construing the federal Ex Post Facto Clause in our analysis of Ohio's Retroactivity Clause. In considering whether the S.B. 10 amendments to

R.C. Chapter 2950 were substantive or remedial, this court cited the portion of our decision in *Cook* in which we discussed the ex post facto intent-effects test and explicitly stated, " 'There is no absolute test to determine whether a retroactive statute is so punitive as to violate the constitutional prohibition against ex post facto laws; such a determination is a matter of degree.' " *Williams*, 129 Ohio St.3d 344, 2011-Ohio-3374, 952 N.E.2d 1108, at ¶ 10, quoting *Cook*, 83 Ohio St.3d at 418, 700 N.E.2d 570, citing *California Dept. of Corrs. v. Morales*, 514 U.S. 499, 509, 115 S.Ct.1597, 131 L.Ed.2d 588 (1995) (concerning whether a law making parole hearings potentially less frequent violated the Ex Post Facto Clause of the United States Constitution). Much of the remainder of our analysis in *Williams* either referred to or directly recalled what Justice Lanzinger said in her dissenting opinion in *Ferguson*—a dissent that admonished the majority in that case for failing to fully apply the intent-effects test in its analysis of whether the law at issue should be considered punitive and therefore impermissibly retroactive. *See Williams* at ¶ 12-16, citing *Ferguson*, 120 Ohio St.3d 7, 2008-Ohio-4824, 896 N.E.2d 110, at ¶ 45-47 (Lanzinger, J., dissenting); *see also Ferguson* at ¶ 54-61 (Lanzinger, J., dissenting).

{¶ 75} The lead opinion may declare that Ohio's Retroactivity Clause is not in lockstep with the federal Ex Post Facto Clause in criminal cases. But if it does so, it should explain how a claim of retroactive criminal punishment should be differently analyzed under the separate constitutional provisions. If the intent-effects test does not or should not apply in an analysis under the Ohio Constitution's Retroactivity Clause, then what test does or should apply? Once again, the lead opinion does not say. However, it does not escape notice that when the lead opinion does consider the claim that Sierah's Law is punitive and therefore is impermissibly retroactive in violation of Ohio's Retroactivity Clause, the test that it applies is exactly the same as the intent-effects test developed for considering claims brought under the Ex Post Facto Clause of the federal Constitution. In other words, the lead

opinion looks to whether the placement and language of Sierah's Law evinces a legislative intent to create a civil, remedial law, and after finding that legislative intent, it moves on to the *Mendoza-Martinez* factors to discern whether the law is nevertheless punitive in effect.

{¶ 76} The central problem here is that our caselaw has never been clear about what analytical framework applies when a claim of retroactive criminal punishment is raised under Ohio's Retroactivity Clause. Without doing more to clarify our caselaw, it is disingenuous for the lead opinion to proclaim that it must remain faithful to our Retroactivity Clause precedent because such faithfulness " 'promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process.' " Lead opinion at ¶ 44, quoting *Payne v. Tennessee*, 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). By declining to address whether Ohio's Retroactivity Clause incorporates a ban on ex post facto laws, and by declining to say how we should analyze such claims, the lead opinion does nothing to promote the "evenhanded, predictable, and consistent development of legal principles." *Payne* at 827. Rather, the law is left in a liminal state of complete uncertainty.

{¶ 77} The very nature of the situation allows this court, and the courts below it, to use whatever analysis we or they want as long as the analysis *resembles* something that we have done before. For instance, this court might decide that a law is not punitive simply because the legislature did not intend for it to be punitive. That would resemble our Retroactivity Clause analyses in *Cook* and *Ferguson*, in which we paid little to no regard to whether the law *actually functioned* to inflict punishment. Or this court may want to go a bit further in its analysis, as the lead opinion does here, by dabbling in an intent-effects analysis of the law at issue without officially committing to the use of such a test in future cases. But all that this indecision does is maintain litigants' confusion about how and what to argue

38

in cases like this one, and it paves the way for this court to affirm or reverse decisions with relative ease depending on the analysis that the justices in the majority decide to use at any given time. So if the Ohio Constitution does not prohibit ex post facto laws, and if the intent-effects test is not the proper analysis for determining whether a law is punitive and in violation of Ohio's Retroactivity Clause, the lead opinion should make clear what analysis *is* proper.

## II. Sierah's Law Is Punitive

{¶ 78} It is well understood that "ex post facto" is a term that applies only to criminal laws and that the prohibition against ex post facto laws applies to any law that increases or makes more burdensome the punishment for an offense after it has been committed. *See Collins v. Youngblood*, 497 U.S. 37, 42-43, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990). Traditionally, this court and other courts have used the intent-effects test to delineate between civil and criminal laws for purposes of ex post facto analysis. *See, e.g.*, *Cook*, 83 Ohio St.3d at 414-423, 700 N.E.2d 570; *Smith*, 538 U.S. at 92-97, 123 S.Ct. 1140, 155 L.Ed.2d 164; *State v. Trujillo*, 248 Ariz. 473, 477, 462 P.3d 550 (2020). A full and comprehensive application of the test to Sierah's Law demonstrates that it is punitive and may not, therefore, be applied retroactively.

{¶ 79} In applying the intent-effects test, this court must determine first whether the General Assembly, " 'in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other,' "— civil or criminal—and second, if the General Assembly " 'has indicated an intention to establish a civil penalty, * * * whether the statutory scheme was so punitive either in purpose or effect as to negate that intention.' " (Ellipsis added in *Ward.*) *Cook* at 415, quoting *United States v. Ward*, 448 U.S. 242, 248-249, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980). This court has said that "[t]here is no absolute test to determine whether a retroactive statute is so punitive as to violate the constitutional prohibition against ex post facto laws; such a determination is a 'matter of

degree.' " (Emphasis deleted.) *Cook* at 418, quoting *Morales*, 514 U.S. at 509, 115 S.Ct. 1597, 131 L.Ed.2d 588. As the lead opinion acknowledges, the intent-effects factors outlined in *Mendoza-Martinez*, 372 U.S. at 168-169, 83 S.Ct. 554, 9 L.Ed.2d 644, are helpful for determining whether a particular law is, on balance, punitive. Weighed in the balance or subjected to a careful measurement of "degree," Sierah's Law is punitive.

### A. *The Legislative Intent Is Mixed*

{¶ 80} The lead opinion notes that nothing in the statutory language of Sierah's Law indicates that the intent behind it was to inflict punishment. That is perhaps true if one looks solely for an express proclamation such as "the purpose of this statute is to punish," or some similar language. But in fact, there is a fair amount of evidence in the statute's language demonstrating the legislature's punitive and not purely remedial intent.

{¶ 81} To begin, Sierah's Law does not expressly state that its requirements are "civil" in nature or are intended to be "nonpunitive" or "remedial." *See* R.C. 2903.41 through 2903.44. That makes the present case different from our past cases concerning Ohio's sex-offender-registration laws in which we relied heavily on the General Assembly's explicit statements that its intent was to enact civil, nonpunitive, and regulatory laws. *See, e.g.*, *Cook*, 83 Ohio St.3d at 416-417, 700 N.E.2d 570 (concluding that the General Assembly's nonpunitive intent was established by its express statements in the law that "it [wa]s the *general assembly's intent to protect the safety and general welfare of the people of this state*," and that community notification was "a means of assuring public protection and that the exchange or release of that information [wa]s *not punitive*" [emphasis sic]). The fact that the General Assembly knows how to make its intent clear when it comes to criminal-registration statutes but failed to do so here indicates that it did not harbor the same nonpunitive intent when it established Sierah's Law.

40

{¶ 82} Importantly, the General Assembly chose to place Sierah's law in Title 29 of the Revised Code, which contains criminal statutes, rather than in Title 37, which relates to "Health-Safety-Morals," or any number of other titles in which a nonpunitive, civil law might be found. That alone is not dispositive of the legislature's intent, but it does indicate that the General Assembly may have meant the law to be punitive in nature and degree as opposed to merely remedial and civil in nature. *See Kansas v. Hendricks*, 521 U.S. 346, 361, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997) ("Kansas'[s] objective to create a civil proceeding is evidenced by its placement of the [Sexually Violent Predator] Act within the Kansas probate code, instead of the criminal code").

{¶ 83} Regardless of where Sierah's Law was placed in the Revised Code, there is additional and important evidence of the legislature's punitive intent, which the lead opinion effectively ignores. One instance is the ease with which a person may be shunted from a limited period of reporting to an indefinite or potentially *lifetime* reporting requirement under the law. R.C. 2903.43(D)(2) provides that the trial court *must* indefinitely extend a person's reporting obligation beyond ten years if, upon motion by the prosecutor, the court "finds that the [person] has violated a term or condition of a sanction imposed under the [person's] sentence or has been convicted of or pleaded guilty to another felony or any misdemeanor offense of violence during [the ten-year] enrollment period." The very possibility for so dramatic of an extension of reporting is itself plainly punitive; the ease with which a reporting period may be extended only compounds the sense of a punitive purpose.

{¶ 84} Although R.C. 2903.43(D)(2) and 2903.44(A) allow a person to request the termination of his extended reporting period by filing a motion with the common pleas court, the person's ability to achieve termination of his extended reporting obligations is severely constrained under the terms of the statute. For example, a person may be considered ineligible for termination of an extended

reporting requirement if he has not "paid all financial sanctions imposed upon [him] pursuant to section 2929.18 or 2929.28 of the Revised Code," R.C. 2903.44(B)(4). This provision establishes a direct connection between the obviously punitive financial sanctions that are imposed as part of the underlying sentence and the purported *non*punitive provisions of Sierah's Law.[7]  Moreover, because the offenses giving rise to violent-offender status are high-level felonies, *see* R.C. 2903.41(A)(1), the offenses carry the potential for large financial sanctions, *see* R.C. 2929.18(A)(3).  When coupled with the fact that people who have been convicted of registration-eligible offenses often have difficulty finding work, it becomes not just possible but probable that a person who has served his time and then lived a law-abiding life will nevertheless be obligated to report indefinitely, simply because he has not been able to pay large fines that might be decades old. Thus, the fact that the General Assembly has seen fit to use the extended-reporting mechanism to enforce underlying criminal sanctions all but conclusively demonstrates a punitive rather than a remedial intent.  That is especially so given that an unpaid fine *by itself* may be enough to bring about indefinite reporting, with no discretion given to the trial court.  *Compare* R.C. 2903.43(D)(2) (extended reporting required when court finds "that the [person] has violated a term or condition of a sanction imposed under the [person's] sentence") *with* R.C. 2967.28(D)(1) (parole board permitted to include as a term or condition of postrelease control the payment of any "financial sanction that the sentencing court was authorized to impose pursuant to section * * * 2929.18 of the Revised Code").

---

7. Importantly, financial sanctions are a source of revenue for the state of Ohio.  In the words of late United States Supreme Court Justice Antonin Scalia, "it makes sense to scrutinize governmental action more closely when the State stands to benefit." *Harmelin v. Michigan*, 501 U.S. 957, 978, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991), fn. 9.  *See also* Baszynski, *Uncovering Official Lawlessness in Ohio's Criminal Court Debt Assessment and Collection: A Toolkit for Defenders*, 81 Ohio St.L.J. 1065 (2020) (noting myriad ways in which Ohio's criminal-justice system improperly generates revenue through the imposition of fines and costs on criminal defendants).

{¶ 85} Contrary to what the lead opinion says, Sierah's Law is not merely a remedial tool for aiding law enforcement in investigating crimes. Although the Violent Offender Database itself may not be accessible to the public, most of the information on the database is accessible to the public, because Sierah's Law specifically requires that the information be made available to it. Pursuant to Sierah's Law, any person may obtain from a local sheriff's office much of the same information about the registrants that is included in the database. *See* R.C. 2903.43(F). This includes a slew of personal information that is not readily available online or by looking up the person's criminal history, such as the person's address, updated photograph, fingerprints and palmprints, license-plate number, vehicle type and description, place of employment and employer's address, and the name and address of any school or institution of higher education that the person attends. *See id.*; R.C. 2903.43(C). If the legislature had merely wanted to create a law-enforcement tool, it would not have made this information a matter of public record.

{¶ 86} To be sure, and as the state and its amicus curiae point out, there is evidence of the legislature's remedial intent within Sierah's Law. Although the remedial intent is not expressly stated, as it was in Ohio's sex-offender-registration laws, the fact that a court must consider several factors when deciding whether to relieve a person of the presumptive reporting requirement on the ground that he was not the principal offender, including the offender's risk of recidivism and continued threat to the community, implies a public-safety component. *See* R.C. 2903.42(A)(4). Nevertheless, after carefully considering the provisions of Sierah's Law as a whole, it is clear that the legislature had at least mixed intentions in enacting the law. Accordingly, it may not be said that the law was intended to be purely remedial. At best, the legislative intent behind the law is ambiguous.

### *B. Sierah's Law Is Punitive in Effect*

**{¶ 87}** After determining the legislative intent behind the law, the next step in the intent-effects test is to inquire into whether the statutory scheme is so punitive in either purpose or effect that it overrides any suggestion that the legislature's intent was to create a civil, remedial law. *See Cook*, 83 Ohio St.3d at 415-418, 700 N.E.2d 570; *Smith*, 538 U.S. at 92, 123 S.Ct. 1140, 1146, 155 L.Ed.2d 164. When the legislature has expressed a *clear* intent to create a civil, remedial law " 'only the clearest proof' " of the law's punitive purpose or effect "will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *Hudson v. United States*, 522 U.S. 93, 100, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997), quoting *Ward*, 448 U.S. at 249, 100 S.Ct. 2636, 65 L.Ed.2d 742. In cases like this one, however, when the legislative intent behind the law is ambiguous, the evidence showing that a law is civil in nature should not be given the same weight. *See Hudson* at 114 (Souter, J., concurring in the judgment) (" 'clearest proof' of criminal character * * * [is] a function of the strength of the countervailing indications of civil nature").

**{¶ 88}** In *Mendoza-Martinez*, 372 U.S. at 168-169, 83 S.Ct. 554, 9 L.Ed.2d 644, the United States Supreme Court listed the following factors for determining whether a law is punitive in purpose or effect:[8] (1) "whether the sanction involves an affirmative disability or restraint," (2) "whether it has historically been regarded as a punishment," (3) "whether it comes into play only on a finding of scienter,"

---

8. The lead opinion characterizes the *Mendoza-Martinez* factors as "an interpretative tool to gauge legislative intent." Lead opinion at ¶ 33. That is not entirely correct. The factors actually assist a court in determining whether a law functions as punishment—either in purpose or effect—despite what the legislature may have intended. *See Ward* at 249. And although I agree with the lead opinion's statement that "[w]e apply these factors because they are useful" and are not required to apply them, lead opinion at ¶ 33, Ohio's Retroactivity Clause (and the federal Ex Post Facto Clause) nevertheless *does* require a determination of whether a particular law *actually functions as punishment*. The factors assist in that determination, which is why they are useful. If the justices in the lead opinion have a different way of determining whether a law is punitive, they should certainly use this case as an opportunity to announce it.

(4) "whether its operation will promote the traditional aims of punishment—retribution and deterrence," (5) "whether the behavior to which it applies is already a crime," (6) "whether an alternative purpose to which it may rationally be connected is assignable for it," and (7) "whether it appears excessive in relation to the alternative purpose assigned."

{¶ 89} An analysis of the *Mendoza-Martinez* factors leads to the conclusion that Sierah's Law is punitive in purpose and effect and is therefore unconstitutional when it is applied retroactively. Several of the *Mendoza-Martinez* factors easily apply here. First, it is clear that the behavior that Sierah's Law concerns is already criminalized. A person is not considered a "violent offender" and subject to reporting under the law unless he has been convicted of a specified criminal offense. *See* R.C. 2903.41(A)(1). Second, the operation of Sierah's Law promotes the traditional aims of punishment. Once a person is convicted of a registration-eligible offense, he immediately goes from being merely a person who *has been convicted* of a violent offense to a person *who is presumed* to be a violent offender for a specified period of time, *see* R.C. 2903.42(A)(1). The person might have to register for his lifetime, *see* R.C. 2903.43(D)(2) and R.C. 2903.44, and the person is subject to a number of reporting obligations, *see* R.C. 2903.43(A) through (D) and (F). Reporting not only leads to the person's information being placed in the Violent Offender Database, *see* R.C. 2903.42(A)(1) and 2903.43(F), but it may also lead to the dissemination of a large portion of his reported information to the public simply through a public-records request, *see* R.C. 2903.43(F)(3). In other words, Sierah's Law serves to increase police and community monitoring of people who have been convicted of certain offenses and to punish, particularly by requiring indefinite reporting in response to noncompliance with the terms of the underlying criminal sentence. R.C. 2903.43(D)(2). Further, Sierah's Law comes into play on a finding of scienter, and the lead opinion's assertion to the contrary is disingenuous. A person is not subject to the law unless he is convicted of one of

several specified offenses, each of which requires proof of scienter. *See* R.C. 2903.42(A)(1). Additionally, it is clear on the face of the law that scienter is a requirement for its application. *See* R.C. 2903.42(A)(4)(a)(iii) (requiring the court to consider "[t]he degree of culpability or involvement of the offender in the offense at issue" when deciding whether a person should be relieved of reporting duties because of his nonprincipal-offender status). Together, those three factors suggest a punitive purpose or effect that weighs heavily against interpreting Sierah's Law to be civil in nature.

### C. Whether the Law Involves an Affirmative Disability or Restraint

{¶ 90} Another factor to be considered is whether the law involves an affirmative disability or restraint. *Mendoza-Martinez*, 372 U.S. at 168-169, 83 S.Ct. 554, 9 L.Ed.2d 644. To a large extent, Sierah's Law does so. The law requires an eligible offender to register annually with the local sheriff's office for at least ten years, in person, and within ten days of the anniversary of his or her enrollment in the database. R.C. 2903.42(A)(1) and 2903.43(A) and (D)(1). The person is also obligated to notify the sheriff within three days of any change of address. R.C. 2903.43(E). If the change of address results in the person living outside the jurisdiction of the sheriff with whom he originally enrolled, then the person must re-enroll with the sheriff in the new jurisdiction and notify the sheriff in the previous jurisdiction of the move. R.C. 2903.43(D)(1). Compliance with those provisions is no small burden. And Sierah's Law includes still more requirements, *see* R.C. 2903.43(C) (listing personal information that must be disclosed), and failing to satisfy any of the requirements results in actual criminal liability, R.C. 2903.43(I).

{¶ 91} If a registrant recklessly misses his deadline to enroll, re-enroll, or give notice of a change of address, the law states that he has committed a *felony*. *See id.* Because of that, and because the failure to comply with the requirements *also* "shall constitute a violation of the terms and conditions of the community

control sanction, parole, post-release control sanction, or other type of supervised release," R.C. 2903.43(I)(2), the failure may trigger indefinite and potentially lifelong reporting, *see* R.C. 2903.43(D)(2) (the court must extend reporting when it finds "that the offender has violated a term or condition of a sanction imposed under the offender's sentence or that the offender has been convicted of or pleaded guilty to another felony* * * during the ten-year enrollment period"), and R.C. 2903.44(F)(3) (the court has no discretion to terminate extended reporting when the prosecution proves that the "offender was convicted of or pleaded guilty to any other felony").

{¶ 92} To say that this scheme does not impose an affirmative disability or restraint on a person is to ignore the obvious. At a minimum, it is not difficult to see how a person's freedom of movement is restricted by the law. Each time that a person moves to a different county, he is subject to several reporting obligations that he must execute within a very limited time frame or else be subject to a felony charge and extended and potentially lifelong reporting.

{¶ 93} For these reasons, I wholly disagree with the lead opinion that the reporting obligations are a " 'de minimis administrative requirement,' " the inconvenience of which is " 'comparable to renewing a driver's license.' " Lead opinion at ¶ 34, quoting *Cook*, 83 Ohio St.3d at 418, 700 N.E.2d 570. Such glib minimization should not serve as a substitute for addressing serious constitutional infringements. The failure to renew one's driver's license once *every four or eight years*, as Ohio law requires, R.C. 4507.09(A), results in nothing more than a loss of driving privileges lasting only until one's license is renewed, not a felony conviction like that for the failure to report under Sierah's Law, R.C. 2903.43(I). The failure to report also results in the potential for the termination of postrelease control, community control, or parole—whichever may apply. *Id*. And in addition to that reality, the failure to report may result in an extended or lifelong period of

reporting. *See* R.C. 2903.43(D)(2); R.C. 2903.44(F)(3). The driver's license analogy is clearly flawed.[9]

### D. *Whether the Punitive Aspects of the Law Are Historically Regarded as Punishment*

**{¶ 94}** The next factor to be considered is whether the type of sanction imposed has been historically regarded as punishment. *Mendoza-Martinez*, 372 U.S. at 168-169, 83 S.Ct. 554, 9 L.Ed.2d 644. The lead opinion says little about this factor other than to point out that approximately two decades ago, the United States Supreme Court—in reviewing an entirely different reporting law—"rejected the notion that in-person registration is akin to probation, supervised release, or public shaming." Lead opinion at ¶ 36, citing *Smith*, 538 U.S. at 84, 98, 101, 123 S.Ct. 1140, 155 L.Ed.2d 164. Although it is true that the Supreme Court in *Smith* held that Alaska's sex-offender-registration and notification laws were different from other historical forms of punishment, *see Smith* at 97-99, the lead opinion here leaves out certain relevant contextual information that informed the court's decision in *Smith*: information that is necessary for a true understanding of why the Supreme Court held as it did and why its conclusion was different regarding this *Mendoza-Martinez* factor.

**{¶ 95}** To begin, the Alaska law at issue in *Smith* lacked an in-person registration requirement. *Smith* at 101. That fact was mentioned by the Supreme Court in concluding that the law did not involve an affirmative disability and was not sufficiently akin to probation or supervised release. *Id.* Further, unlike probation and supervised release, the reporting law at issue in *Smith* did not include any mandatory conditions that would "allow the supervising officer to seek the

---

9. Beginning July 1, 2022, Ohio will permit online renewal of a driver's license or identification card. R.C. 4507.061. It thus seems that even the "de minimis" administrative requirement of in-person driver's license renewal stood out to the legislature as something that is unnecessarily burdensome in today's technology age.

revocation of probation or release in case of infraction." *Id.* The same may not be said for Sierah's Law. Not only is Sierah's Law explicit in its requirement of in-person registration, *see* R.C. 2903.43(A), it is also explicit that any violation of the registration and notification requirements "shall constitute a violation of the terms and conditions of the community control sanction, parole, post-release control sanction, or other type of supervised release," R.C. 2903.43(I). Accordingly, the bases upon which the Supreme Court distinguished Alaska's sex-offender-registration law from other traditional forms of supervised release do not exist regarding Sierah's Law.

{¶ 96} Further, at the forefront of the Supreme Court's application of the *Mendoza-Martinez* factors in *Smith* was its unequivocal determination that the Alaska legislature intended the law to serve as a civil, nonpunitive means of identifying prior offenders for the protection of the public, which was based on the high incidence of recidivism of such offenders. *See id.* at 92-93, 102-103. The court began its discussion by noting that the " 'fairly recent origin' " of sex-offender-registration and notification laws suggests that the law at issue was not "meant as a punitive measure, or, at least, that it did not involve a traditional means of punishing." *Id.* at 97, quoting *Doe I v. Otte*, 259 F.3d 979, 989 (9th Cir.2001). From there, the court went on to discuss whether certain provisions in the law, primarily the community-notification requirements, nevertheless resembled the type of "shaming" punishments used during the colonial era. *Id.* at 97-98. Although the court determined that some colonial-era punishments were meant to inflict public disgrace and humiliation through the imposition of corporal punishment before a public audience, and also included public shaming and banishment, the court held that any initial resemblance that the notification and registration laws might have to those earlier forms of punishment was misleading. *See id*. The court noted that unlike the reporting and notification laws at issue, colonial shaming laws "involved more than the dissemination of information." *Id.*

at 98. "They either held the person up before his fellow citizens for face-to-face shaming or expelled him from the community." *Id.* The court then stated:

> By contrast, the stigma of Alaska's Megan's Law results not from public display for ridicule and shaming but from the dissemination of accurate information about a criminal record, most of which is already public. Our system does not treat dissemination of truthful information in furtherance of a legitimate governmental objective as punishment. * * * The publicity may cause adverse consequences for the convicted defendant, running from mild personal embarrassment to social ostracism. In contrast to the colonial shaming punishments, however, the State does not make the publicity and the resulting stigma an integral part of the objective of the regulatory scheme.

*Id*. at 99. Thus, a review of what the court actually said in *Smith* reveals that its approach to the historical-punishment question was delimited from the start by its initial finding that the Alaska legislature intended to enact a remedial, regulatory scheme.

{¶ 97} If it were Sierah's Law on review by the United States Supreme Court, as opposed to the Alaska statute at issue in *Smith*, there is no reason whatsoever to believe that the court would have reached the same conclusion. As discussed in detail above, Sierah's Law contains no explicit statement of the legislature's intent. It contains no legislative finding that people subject to the law recidivate at high rates. To the contrary, evidence shows that people convicted of serious violent offenses have some of the *lowest* recidivism rates of all felony offenders. *See* Prescott, Pyle, & Starr, *Understanding Violent-Crime Recidivism*, 95 Notre Dame L.Rev. 1643, 1668, 1670 (2020) (focusing on all types of serious

violent offenses and noting that "[t]aken as a whole, * * * data suggest[s] that those incarcerated for serious violent offenses reoffend at relatively low rates compared to other released individuals," and that regarding homicide offenses, "almost every study finds repeat-homicide recidivism rates at or below 1%"). Homicide-offense recidivism is particularly relevant here, because Sierah's Law applies when a person is convicted of any of five enumerated offenses, three of which are homicide offenses: aggravated murder, murder, and voluntary manslaughter. *See* R.C. 2903.41(A)(1)(a).

{¶ 98} By contrast, the lead opinion cites the United States Sentencing Commission's 2019 report to Congress on recidivism among federal violent offenders, which is of little use in the context of Sierah's Law because the report encompasses all types of violent offenses, from homicide offenses down to simple assault and hit-and-run traffic offenses that involve bodily injury. United States Sentencing Commission, *Recidivism Among Federal Violent Offenders* 5 (2019), available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2019/20190124_Recidivism_Violence.pdf (last accessed Oct. 12, 2021) [https://perma.cc/UK8F-KVRL]. The report also includes offenses that, depending on their circumstances, may not involve any violent conduct whatsoever, such as blackmail and extortion. *See id.* Additionally, the statistics cited in the lead opinion measured recidivism rates based on a subsequent arrest, not a subsequent conviction. *See id.* at 3-4, 13. And in that regard, the report makes clear that classification as a recidivist may be based on arrests for alleged violations of supervised release, probation, or parole related to the underlying offense. *Id.* at 5. Accordingly, under the report, a person may be labeled a violent-offender "recidivist" merely because he was arrested for failing to report to his probation officer.

{¶ 99} There is simply no way to discern from this report whether people who are convicted of any of the five violent offenses enumerated in Sierah's Law

will reoffend by committing a new violent crime. Thus, the far better measure is to look at the recidivism rates for homicide offenders. And as the lead opinion notes, those offenders may have low recidivism rates because they "typically receive longer sentences and 'age out' of committing additional violent crimes." Lead opinion at ¶ 41. This, in turn, highlights the pointlessness of requiring people who have some of the lowest recidivism rates to register in the Violent Offender Database.

{¶ 100} On top of everything else, Sierah's Law has punitive components that may not be justified by any logical concern for public safety. If faced today with a law like Sierah's Law, the Supreme Court would have a much harder time discerning whether the public-access-to-information aspect of the law—which results in the "adverse consequences" of embarrassment and social ostracism, *Smith*, 538 U.S. at 99, 123 S.Ct. 1140, 155 L.Ed.2d 164—furthers the law's "legitimate governmental objective," *id.* at 98. It goes without saying that a court must be able to define what the legitimate governmental objective behind a law is before it may discern whether any aspect of the law furthers its objective. Even if we assume that the objective behind Sierah's Law is the protection of the public, its legitimacy is dependent on whether, on average, people subject to it pose a future safety risk to society. We have little evidence of that.

{¶ 101} Lastly, the Supreme Court's decision in *Smith* should not serve as our lodestar. It has now been two decades since the court decided *Smith*. It may no longer be said that criminal-offender registries " 'are of fairly recent origin,' " *id.* at 97, quoting *Otte*, 259 F.3d at 989. Two decades worth of research has revealed quite a bit about what such registries actually do and whether they accomplish their promulgators' avowed goal of protecting the public. The results are not good. Although the court in *Smith* held that Alaska's sex-offender-registration laws were properly based on an understanding that "[t]he risk of recidivism posed by sex offenders is 'frightening and high,' " *id.* at 103, quoting *McKune* v. *Lile*, 536 U.S.

52

24, 34, 122 S.Ct. 2017, 153 L.Ed.2d 47 (2002),[10] newer research has consistently suggested that sex offenders reoffend at much lower rates than previously thought. For instance, one study by the United States Department of Justice that involved following the progress of every sex offender released in 15 states for three years found that the reconviction rate for a new sex offense was just 3.5 percent. Langan, Schmitt, & Durose, *Recidivism of Sex Offenders Released from Prison in 1994*, at 2 (2003), available at https://bjs.ojp.gov/content/pub/pdf/rsorp94.pdf. (accessed Oct. 12, 2021) [https://perma.cc/55JA-TS9L]. Another study from 2012 examined the recidivism rate of sex offenders in Connecticut and found that only 2.7 percent were convicted of a new sex offense within five years of their release from prison. State of Connecticut Office of Policy and Management, Criminal Justice Policy & Planning Division, *Recidivism Among Sex Offenders in Connecticut*, at 4 (2012), available at https://www.womenagainstregistry.org/Resources/pdf/sex_offender_recidivism_2 012_final.pdf (accessed Oct. 12, 2021**)** [https://perma.cc/7FZF-AJ9B]. And as the Sixth Circuit has recently noted, other evidence suggests that "offense-based public registration has, at best, no impact on recidivism" and may "actually *increase* the risk of recidivism, probably because they exacerbate risk factors for recidivism by making it hard for registrants to get and keep a job, find housing, and reintegrate

---

10. The court in *McKune* specifically cited United States Department of Justice, National Institute of Corrections, *A Practitioner's Guide to Treating the Incarcerated Male Sex Offender; Breaking the Cycle of Sexual Abuse* xiii (1988), which states that the recidivism rate is estimated to be as high as 80 percent for untreated sex offenders and around 15 percent for those who receive treatment. This aspect of the *McKune* decision has been highly criticized as being wholly incorrect. *See* Ellman & Ellman, *"Frightening and High": The Supreme Court's Crucial Mistake About Sex Crime Statistics*, 30 Const.Comment. 495, 497-498 (2015) (tracing the origins of the phrase "frightening and high" back to an unsupported assertion in "a mass market magazine aimed at a lay audience"); *see also State v. Chapman*, 944 N.W.2d 864, 879 (Iowa 2020) (Appel, J., concurring), quoting Ellman & Ellman, 30 Const.Comment. at 499 (admonishing fellow justices of the Iowa Supreme Court for adopting the phrase "frightening and high" unquestioningly, because the "source of the statement was an article published in *Psychology Today* and was 'just the unsupported assertion of someone without research expertise who made his living selling such counseling programs to prisons' ").

into their communities." (Emphasis sic.) *Does #1-5 v. Snyder*, 834 F.3d 696, 704-705, (6th Cir.2016), citing Prescott & Rockoff, *Do Sex Offender Registration and Notification Laws Affect Criminal Behavior?*, 54 J.L. & Econ. 161 (2011).

{¶ 102} Had the court in *Smith* known then what we have learned since its decision in that case, who knows what the outcome would have been? At the very least, the court would have had to grapple with the mountain of data showing the lack of need for such registries and anecdotal evidence showing the indignities, shame, social ostracism, and very real fear that people subject to reporting and notification laws suffer. *See generally* Carpenter & Beverlin, *The Evolution of Unconstitutionality in Sex Offender Registration Laws*, 63 Hastings L.J. 1071 (2012) (describing a community of people living under a causeway in Miami, Florida because they are unable to find housing, describing how the shame of reporting has led people to commit suicide, and describing how those subject to reporting have been murdered by vigilantes). And then the court would have to call all of that a "collateral consequence," *Smith*, 538 U.S. at 99, 123 S.Ct. 1140, 155 L.Ed.2d 164, of a remedial scheme that appears not to remediate anything but rather appears to cause an increase in crime. In other words, it would undoubtedly be harder to sincerely say that offender registries do not resemble historical forms of shaming punishments, when shaming is all that is left when the rest is stripped away.

*E. Whether the Law Is Excessive in Relation to its Remedial Purpose*

{¶ 103} The final two *Mendoza-Martinez* factors are related to each other. The first of those factors asks whether "an alternative purpose to which [the law] may rationally be connected is assignable for it." *Mendoza-Martinez*, 372 U.S. at 168-169, 83 S.Ct. 554, 9 L.Ed.2d 644. In other words, this factor asks whether the law advances a legitimate, regulatory purpose. *See, e.g.*, *Doe v. State*, 189 P.3d 999, 1015 (Alaska 2008). The final factor asks whether the law seems excessive in relation to the alternative purpose assigned to it. *Mendoza-Martinez* at 169.

{¶ 104} As to the first factor, of course there may be a legitimate regulatory purpose behind Sierah's Law. But as noted above, it is difficult to say for certain what the legislature intended, because the law does not include a statement of purpose and some aspects of the law are undoubtedly punitive whereas others evince a remedial purpose aimed at public safety. In short, there are grounds for saying that the legislature might have intended to remediate a perceived public-safety risk posed by people who have been convicted of violent offenses by providing law enforcement and the community with information about their physical characteristics and where they reside. But again, the lack of any evidence or legislative findings showing that such people are likely to recidivate and the lack of any evidence showing the efficacy of such a registration scheme weakens the legitimacy of any remedial aim of the law.

{¶ 105} Again, the final *Mendoza-Martinez* factor asks whether the law appears excessive in relation to its assigned remedial purpose. *Id.* at 169. Sierah's Law satisfies that criterion. As noted above, this factor is often considered the most important component of the comprehensive ex post facto analysis. Throughout the years, this court and others have from time to time determined that registration and public-disclosure schemes are a legitimate way to protect the public from people deemed to have a high risk of reoffending. *See, e.g.*, *Cook*, 83 Ohio St.3d 404, 700 N.E.2d 570; *see also Smith*, 538 U.S. 84, 123 S.Ct. 1140, 155 L.Ed.2d 164. For the reasons stated above, the time has come for us to reevaluate the legitimacy of such laws. But nevertheless, even when in the past a class of people were deemed to have a high risk of recidivating, if registration and public-disclosure requirements were not tied to a public-safety risk, an implication of excessiveness arose. *See, e.g.*, *Williams*, 129 Ohio St.3d 344, 2011-Ohio-3374, 952 N.E.2d 1108, at ¶ 20 (that judges were no longer permitted to review a sex offender's statutory classification weighed in favor of finding the law to be excessive); *Doe v. State*, 189 P.3d at 1017, fn. 143 (that "[Alaska's registration

scheme did] not authorize a court to determine that a registrant poses no risk to society and consequently to altogether relieve him of registration and disclosure obligations" weighed in favor of finding the law to be excessive); *State v. Letalien*, 2009 ME 130, 985 A.2d 4, ¶ 4-6, 48 (that Maine's sex-offender-registration law was amended to eliminate a court's ability to waive registration on a showing of reasonable likelihood that registration was no longer necessary weighed in favor of finding the law to be excessive).

{¶ 106} Sierah's Law requires people convicted of certain offenses to annually report a significant amount of personal information to law enforcement and much of that information is available to the public, upon request. *See* R.C. 2903.41(A)(1); R.C. 2903.42(A)(1); R.C. 2903.43(A) through (F). Outside the limited exception pertaining to nonprincipal offenders (who still may be required to register despite not being a principal offender), *see* R.C. 2903.42(A)(2) through (A)(4), a person is not allowed to present any evidence to the court of his low risk of recidivism. Additionally, a person is required to register for an initial period of ten years, regardless of whether he actually poses a risk to the public and regardless of any mitigating circumstances surrounding the underlying offense. *See* R.C. 2903.43(A)(1). Moreover, Sierah's Law, which is unlike any other registration scheme that we have considered, all but requires that a person's reporting obligation be extended indefinitely under certain circumstances and upon the prosecutor's request. *See* R.C. 2903.43(D)(2). If the court finds that the person "has violated a term or condition of a sanction imposed under [his] sentence" or if the court finds "that the [person] has been convicted of or pleaded guilty to another felony or any misdemeanor offense of violence during the ten-year enrollment period," the court has *zero* discretion to not extend the person's reporting obligations indefinitely. *Id*. Although a person may file a motion to terminate his extended reporting requirement, the person's actual ability to successfully prevail on such a motion is limited. *See* R.C. 2903.44. A person may not file a motion to terminate his

reporting obligation either during the initial ten-year reporting period or more than once every five years after the initial reporting period, *see* R.C. 2903.44(A), and again, a trial court has *zero* discretion to terminate an extended reporting requirement if it finds that the person has been convicted of or pleaded guilty to *any other felony* (regardless of degree or type) or any misdemeanor offense of violence during the offender's ten-year enrollment period or extended enrollment period. R.C. 2903.44(F)(3).

{¶ 107} Considering all those indicia of excessiveness—which the lead opinion practically ignores—it is difficult to reach any conclusion other than that the law is excessive in relation to its purported remedial purpose of protecting the public. A close review of the law shows that the General Assembly has not said what makes the people who are subject to Sierah's Law a public-safety risk to begin with; nor does it seem to have a clear vision of from what it is trying to protect the public. It is unclear whether the General Assembly is concerned that these individuals are more likely to commit another violent offense, or that they are more likely to commit any offense, or both. If violent-offense recidivism is the focus of the public-safety concern, then imposing a potential lifetime reporting obligation if the person commits *any other felony*, *see* R.C. 2903.44(F)(3), is excessive and plainly punitive. It may not seriously be said, for example, that passing a bad check in violation of R.C. 2913.11, which is a fifth-degree felony, signifies some sort of propensity to commit additional violent offenses. If, on the other hand, remediating the risk of any type of criminal recidivism is the focus of the law, then a ten-year reporting requirement that may easily turn into a lifetime reporting requirement is excessive in relation to the risk posed by a person who has been convicted of a nonviolent felony such as theft or drug possession. Similarly, it is hard to imagine how the imposition of extended reporting requirements for a violation of *any term or condition* of the person's underlying sentence tends to serve the remedial goal of protecting the public—whether that be from violent crime or any other type of

crime. There is limited logic on which to find that the public is seriously at risk of a violent offense because a person forgot to check in with his probation officer for a month or that a person's inability to pay restitution or a fine will result in that person committing a violent offense. The fact that there is little, if any, rational connection between a purported public-safety goal and how the legislature hopes to achieve that goal shows just how excessive Sierah's Law is.

### F. Evaluation of All the Factors

{¶ 108} A thorough assessment of the *Mendoza-Martinez* factors demonstrates that Sierah's Law is punitive in effect and therefore unconstitutionally retroactive. Although a number of the factors are closely related to each other and may not be enough to show a punitive effect by themselves or with each other, the factors relating to affirmative disability or restraint, historical forms of punishment, and excessiveness in relation to a nonpunitive purpose decisively tip the scales. Accordingly, I would hold that Sierah's Law is punitive and therefore may not be applied retroactively based on the prohibition against retroactive punishment contained in Article II, Section 28 of the Ohio Constitution.

DONNELLY and BRUNNER, JJ., concur in the foregoing opinion.

———————————

Michael T. Gmoser, Butler County Prosecuting Attorney, and Michael Greer, Assistant Prosecuting Attorney, for appellee.

Timothy Young, Ohio Public Defender, and Victoria Bader, Assistant Public Defender, for appellant.

Dave Yost, Attorney General, Benjamin M. Flowers, Solicitor General, Michael J. Hendershot, Chief Deputy Solicitor General, and Stephen P. Carney, Deputy Solicitor General, urging affirmance for amicus curiae Ohio Attorney General Dave Yost.

Alexandra S. Naiman, urging reversal for amici curiae Ohio Justice & Policy Center, Advocating Opportunities, Ohio Domestic Violence Network, and Ohio Association of Reentry Coalitions.

_____